[No. B211679. Second Dist., Div. Six. Jan. 27, 2010.]

THE PEOPLE, Plaintiff and Respondent, v.
GEOVANNY LEON, Defendant and Appellant.

454

## COUNSEL

Sharon M. Jones, under appointment by the Court of Appeal, for Defendant and Appellant.

Edmund G. Brown, Jr., Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Pamela C. Hamanaka, Assistant Attorney General, Steve E. Mercer and J. Michael Lehmann, Deputy Attorneys General, for Plaintiff and Respondent.

## OPINION

**YEGAN, J.**—Geovanny Leon, also known as "Chucky," appeals from the judgment entered following his conviction by a jury of one count (count 1) of first degree murder (Pen. Code, §§ 187, subd. (a), 189),[1] two counts (counts 2 & 3) of willful, premeditated, and deliberate attempted murder (§§ 664, subd. (a), 187, subd. (a)), one count (count 4) of discharging a firearm at an occupied motor vehicle (§ 246), and one count (count 5) of discharging a firearm at an inhabited dwelling house (*ibid.*). As to each of counts 1 through 4, the jury found true an allegation that appellant had personally and intentionally discharged a firearm and had proximately caused death to Jose Blanco. (§ 12022.53, subd. (d).) As to count 5, the jury found true an allegation that a principal had personally and intentionally discharged a firearm. (§ 12022.53, subds. (c) & (e)(1).) As to all counts, the jury found true allegations that the felonies had been committed for the benefit of a criminal street gang. (§ 186.22, subd. (b)(1)(B) & (C).) The trial court imposed an aggregate prison term of 145 years to life. All individual terms of imprisonment were ordered to run consecutively to each other.

Appellant contends that (1) the trial court erroneously allowed the prosecutor to present evidence and make remarks concerning the derivation of appellant's gang moniker; (2) as to the murder and attempted murder convictions, the evidence is insufficient to show beyond a reasonable doubt that appellant acted with the specific intent to kill and with premeditation and deliberation; (3) the trial court abused its discretion in imposing consecutive life terms on each of the two attempted murder counts; and (4) the sentence of 145 years to life constitutes cruel and/or unusual punishment in violation of the federal and state Constitutions.

We conclude that the evidence is insufficient to show beyond a reasonable doubt that appellant harbored the specific intent to kill the attempted murder victim in count 3, Richard Rodriguez. We reverse the conviction on count 3, thereby reducing appellant's sentence by 40 years, from 145 years to life to 105 years to life. We direct the trial court to amend the abstract of judgment and affirm in all other respects.

---

[1] All statutory references are to the Penal Code unless otherwise stated.

*Facts*[2]

Rivera 13 and Pico Nuevo are rival criminal street gangs in the City of Pico Rivera. Since 1990, this rivalry has resulted in "multiple homicides" and "hundreds of shootings and violent assaults." Each gang claims a portion of the city as its territory.

Appellant was a member of Rivera 13. Brian Bray was not a member of Rivera 13, but he "hung out" with Rivera 13 gang members and considered himself to be an associate of the gang. On September 28, 2004, Bray was driving his blue truck in Rivera 13's territory on Passons Boulevard in Pico Rivera. Appellant was seated to the right of Bray in the front passenger seat. The time was just before 7:00 p.m. It was still light outside.

Bray stopped the truck and was waiting to make a left turn. A white Toyota Camry passed the truck on its right side. Bray recognized the driver of the Camry as Richard Rodriguez. Bray knew that Rodriguez "h[u]ng out with Pico Nuevo," an "enemy of Rivera 13." Bray mistakenly believed that there were five males inside the Camry, but he recognized only Rodriguez. Bray aborted the left turn and followed the Camry. His "primary interest was going after Richard Rodriguez."

The Camry actually contained three, not five, occupants. Victor Hernandez was seated in the front passenger seat next to Richard Rodriguez. Jose Blanco was seated behind Hernandez in the right backseat. Richard Rodriguez and Victor Hernandez were "Pico Nuevo associates." This meant that they were "running" and "hanging out" with Pico Nuevo gang members but had not been formally inducted into the gang. Jose Blanco was "a full[-]fledge[d] member of the Pico Nuevo gang."

Rodriguez saw Bray's blue truck following close behind the Camry. He recognized appellant as the person seated in the front passenger seat of the truck. Appellant was "flashing some gang signs with his hands." The gang signs showed his affiliation with Rivera 13. Rodriguez "accelerated his Toyota to try to evade the truck that he believed was pursuing him."

Appellant removed a revolver from his waistband, leaned out of the passenger side window of the truck, and fired one shot. Rodriguez heard Blanco say, "I'm hit." The bullet struck the Camry's right taillight and

---

[2] We summarize only the facts relating to counts 1 through 4 of the information. These counts arose from the same incident. Count 5—discharging a firearm at an inhabited dwelling—concerns an incident that arose on a different date at a different location. Appellant does not challenge the conviction on count 5.

traveled through both the light and the right backseat. The bullet entered Blanco's back and pierced his left lung and heart. The wounds were fatal.

There was animosity between appellant and Blanco. Appellant's sister told the police that the enmity between them stemmed not only from their membership in rival gangs, but also from a dispute over a girl named Shelly. Furthermore, while incarcerated in a juvenile camp, appellant and Blanco "had a fight." Rodriguez testified that, approximately two minutes before the shooting, Blanco had said that he did not like Geovanny and that he and Geovanny were "going to fight."[3]

A gang expert opined that appellant's shooting of Blanco was for the benefit of Rivera 13. The expert explained that, as a Rivera 13 gang member, appellant would have considered it to be "disrespectful" to the gang for a member and associates of Pico Nuevo to be driving through Rivera 13's territory. Pursuant to gang culture, appellant would have been dutybound to take revenge for this act of disrespect. If appellant had done nothing, he would have lost status in the gang. The more violent the act of revenge, the more appellant's fellow gang members would respect him. Appellant would gain the most status from the commission of a homicide.

### Gang Moniker

Appellant contends that the trial court erroneously allowed the prosecutor to present evidence and make remarks concerning the derivation of appellant's gang moniker, "Chucky." During the trial, the gang expert opined without objection that the moniker was derived from a "movie and four sequels" in which "Chucky" is a "homicidal doll" that "comes to life" and "goes about slashing people." A photo album that belonged to appellant contained a page with photographs of both him and the Chucky doll.

Prior to trial, the prosecutor notified the court and defense counsel that, during his opening statement, he intended to display to the jury the page from the photo album showing photographs of appellant and the "Chucky doll from the horror movies." Defense counsel objected. When the trial court asked counsel to state the basis for his objection, counsel responded: "It's argumentative, first of all, your honor." The court asked: "Is the reference to Chucky your objection or the picture of the doll?" Counsel replied, "The picture of the doll. If [the prosecutor] wants to say [that appellant is] known

---

[3] Deputy Kevin Lowe testified that Rodriguez had told him that, when the Camry passed Bray's truck, Blanco "said, 'That's Chucky [appellant's gang moniker] from Rivera.' And he also mentioned that Chucky's name was Geovanny, and that he had had problems with him in the past." Appellant objected on hearsay grounds. The trial court sustained the objection and instructed the jury to disregard Lowe's "comment of what the victim said."

as Chucky, that's fine." Counsel pointed out that the doll is "from a horror movie." The court responded, "I bet you a buck that half of our jurors don't know that."[4] Counsel remonstrated, "If they ever watched television in there [*sic*] life, they saw that stupid thing on there. [¶] . . . I don't like the horror doll being up there." The court declared: "I don't have a problem with it. I don't think its prejudicial to your client at all." Counsel protested: "I believe it is, your honor. I think it's putting him in light of a horror character." The court said "all right" and ordered that the jury be brought into the courtroom.

During his opening statement, the prosecutor displayed the page from the photo album to the jury and stated: "During the course of this trial you'll see a photo album that was taken from the house where [appellant] stayed for a period of time. It was like [appellant's] scrapbook. And this is a page from that scrapbook of [appellant] flashing R, for Rivera, and this little picture of Chucky that was there next to his picture. If you haven't seen that doll before, it's a character from a horror film, I think called <u>Child's Play</u>. He was a killer doll going around killing people. That's where the name Chucky comes from." Defense counsel did not object to the prosecutor's remarks.

At trial evidence was presented that, while appellant was in jail awaiting trial, a deputy sheriff found in his cell a manila envelope containing appellant's property, including a blue book with a "little picture of a Chucky doll" on the cover. Someone had written on the manila envelope, "Rivera kills." Inside the manila envelope was a piece of paper on which someone had written, "The killer. Rivera." Defense counsel did not object to the admission of this evidence.

Defense counsel also did not object when the prosecutor made the following statements about the Chucky doll in closing argument: "[Chucky is] a doll that went around in the movies killing people. That's what the name is modeled after. . . . [¶] That's the defendant. That's who we're dealing with here." "Ask yourself this; why does he call himself Chucky? We know who Chucky is. A Homicidal doll that goes around killing people. That's the person he names himself after. [¶] My point is this ladies and gentlemen, the defendant here premeditated this murder. He's been thinking about this for long before the shooting happened. . . . [T]he defendant has been waiting for this opportunity, God knows how long. [¶] Why do you name yourself after this character? Why? It would be like someone else here saying, 'You know what, call me Charles Manson.' 'Call me the night stalker.' . . . [¶] Chucky; that's who he wants to be like. That's who he wants to be known as."

Appellant argues that "any evidence related to the nature of the Chucky movies or the characteristics of the Chucky doll, was entirely irrelevant,

---

[4] This statement indicates that the trial court anticipated that the prosecutor would display the page from the photo album without explaining the significance of the Chucky doll.

extremely inflammatory, and had absolutely no probative value apart from impermissible inferences that appellant had a predisposition to commit premeditated murder." Even if the evidence had some probative value, appellant asserts that the trial court's admission of the evidence was an abuse of discretion pursuant to Evidence Code section 352.[5] Appellant maintains that the evidence was cumulative and its probative value was substantially outweighed by the probability that its admission would cause undue prejudice. Moreover, appellant claims that "the references . . . to the homicidal nature of the Chucky doll" constituted inadmissible character evidence pursuant to Evidence Code section 1101.

■ Appellant made only one objection to the Chucky doll evidence, and that objection was directed to the prosecutor's opening statement. The sole ground for the objection was that it would be "prejudicial" for the prosecutor to refer to the Chucky doll. This objection arguably was insufficient to invoke Evidence Code section 352. (See *People v. Kipp* (2001) 26 Cal.4th 1100, 1124 [113 Cal.Rptr.2d 27, 33 P.3d 450] [defense counsel failed to invoke § 352 where counsel "made two isolated references to the evidence being 'inflammatory' " and "neither mentioned Evidence Code section 352 nor argued that the probative value of the evidence was substantially outweighed by a risk of undue prejudice"].) Evidence cannot be excluded merely because it is prejudicial. "Virtually all evidence is prejudicial or it isn't material." (*Dollar v. Long Mfg., N.C., Inc.* (5th Cir. 1977) 561 F.2d 613, 618.) Pursuant to section 352, evidence can be excluded only if it is *unduly* prejudicial so as to outweigh its probative value. Nevertheless, for purposes of discussion, we assume that appellant's objection was sufficient to invoke section 352 on undue prejudice grounds. "A trial court's discretionary ruling under this statute ' "must not be disturbed on appeal except on a showing that the court exercised its discretion in an arbitrary, capricious or patently absurd manner that resulted in a manifest miscarriage of justice. [Citations.]" ' [Citation.]" (*People v. Williams* (2008) 43 Cal.4th 584, 634–635 [75 Cal.Rptr.3d 691, 181 P.3d 1035].)

Appellant's other contentions—that the evidence was irrelevant, cumulative, and constituted inadmissible character evidence—are forfeited because he did not object on these grounds at trial. (Evid. Code, § 353, subd. (a); *People v. Doolin* (2009) 45 Cal.4th 390, 437 [87 Cal.Rptr.3d 209, 198 P.3d 11] ["Because defendant objected only that the evidence was irrelevant and unduly prejudicial under Evidence Code section 352, he has forfeited his claim that the trial court admitted this evidence in violation of Evidence Code

---

[5] Evidence Code section 352 provides: "The court in its discretion may exclude evidence if its probative value is substantially outweighed by the probability that its admission will (a) necessitate undue consumption of time or (b) create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury."

sections 1101 and 1102."]; *People v. Partida* (2005) 37 Cal.4th 428, 435 [35 Cal.Rptr.3d 644, 122 P.3d 765] [defendant "may not argue that the court should have excluded the evidence for a reason different from his trial objection"].)

In any event, we conclude that the Chucky doll evidence was not irrelevant, that it was not inadmissible character evidence, and that the trial court did not abuse its discretion in impliedly finding that the probative value of the evidence was not substantially outweighed by a risk of undue prejudice. "Relevant evidence" is defined in Evidence Code section 210 as evidence "having any tendency in reason to prove or disprove any disputed fact that is of consequence to the determination of the action." The Chucky doll evidence had a tendency in reason to prove that, when appellant shot at the Camry, he acted with the specific intent to kill and with both premeditation and deliberation. The evidence showed that appellant knew his moniker was derived from the Chucky doll and that he took pride in the derivation. In the movies the Chucky doll is a "homicidal doll" that "comes to life" and "goes about slashing people." It is reasonable to infer that appellant wanted to emulate the Chucky doll's exploits and show his fellow gang members that his moniker was well warranted since he, like the Chucky doll, was also a killer. In the world of criminal street gangs, appellant's moniker was a badge of honor because it connoted extreme violence. A gang expert testified that for gang members respect is "almost everything," and respect is based on a member's "level of violence." "The more you . . . go and do violence for your neighborhood, the faster you raise your status as a gang member." "So if you know that this guy that's next to you will kill you, or kill the guy across the street, he gets respect."

The Chucky doll evidence was relevant as to appellant's motive and intent. It was not inadmissible character evidence pursuant to Evidence Code section 1101. "That statute prohibits character evidence to prove conduct on a specific occasion but does not prohibit evidence 'that a person committed a crime, civil wrong, or other act when relevant to prove some fact (such as *motive*, opportunity, *intent*, preparation, plan, knowledge, identity, absence of mistake or accident . . .) other than his or her disposition to commit such an act.' (Evid. Code, § 1101, subd. (b).)" (*People v. Jablonski* (2006) 37 Cal.4th 774, 822 [38 Cal.Rptr.3d 98, 126 P.3d 938], italics added.)

The trial court did not abuse its discretion in impliedly finding that the Chucky doll evidence was not unduly prejudicial. " ' " 'The "prejudice" referred to in Evidence Code section 352 applies to evidence which uniquely tends to evoke an emotional bias against the defendant as an individual and which has very little effect on the issues. . . .' " . . . In other words, evidence should be excluded as unduly prejudicial when it is of such nature as to

inflame the emotions of the jury, motivating them to use the information, not to logically evaluate the point upon which it is relevant, but to reward or punish one side because of the jurors' emotional reaction. In such a circumstance, the evidence is unduly prejudicial because of the substantial likelihood the jury will use it for an illegitimate purpose.' [Citation.]" (*People v. Doolin, supra*, 45 Cal.4th at p. 439, citation omitted.)

■ The Chucky doll evidence was highly probative on the issue of appellant's motive and intent. The trial court could have reasonably concluded that this evidence would not so inflame the emotions of the jurors that they would " 'reward or punish one side because of the jurors' emotional reaction.' " (*People v. Doolin, supra*, 45 Cal.4th at p. 439.) The emotional impact of the Chucky doll evidence "paled in comparison to the testimony" concerning the actual shooting. (*Ibid.*) A defendant charged with committing a crime for the benefit of a criminal street gang has no entitlement to an antiseptic portrayal of himself. If he elects to portray himself as a killer before he commits a murder, he should not be able to have what is tantamount to a "name change" thereafter.

The evidence concerning appellant's moniker is similar to tattoo evidence that the courts have admitted to show a gang member's state of mind. In *People v. Ochoa* (2001) 26 Cal.4th 398 [110 Cal.Rptr.2d 324, 28 P.3d 78], a detective testified that the defendant gang member "had on his forehead a tattoo of the number '187,' the California Penal Code section proscribing murder, which had been added after the charged homicides occurred." (*Id.*, at p. 437.) Our Supreme Court concluded that, in admitting evidence of the tattoo and the detective's testimony explaining its significance, the trial court had not abused its discretion under Evidence Code section 352. The court reasoned: "The trial court properly found the tattoo represented an admission of defendant's conduct and a manifestation of his consciousness of guilt. The court reasonably considered the tattoo highly probative, as it would be unlikely that an innocent person would so advertise his connection to murder." (*Ochoa*, at p. 438.)[6] In the instant case, the gang expert's testimony explaining the significance of appellant's moniker was highly probative because it showed that appellant was advertising his intent to model himself after a killer doll. (See also *People v. Monterroso* (2004) 34 Cal.4th 743, 773 [22 Cal.Rptr.3d 1, 101 P.3d 956] [racist tattoo "was relevant to show a motivation for" murder, and its probative value was not "substantially outweighed by its potential prejudicial effect"]; *People v. Skinner* (Colo.Ct.App.2002) 53 P.3d 720, 723 ["[E]vidence of defendant's [racist] tattoo was logically relevant to the issue of intent because it made it more probable that defendant possessed the intent to commit the assault than

---

[6] *Ochoa* was abrogated on another point as noted in *People v. Prieto* (2003) 30 Cal.4th 226, 263, footnote 14 [133 Cal.Rptr.2d 18, 66 P.3d 1123].

without such evidence. Further, it was relevant to the issue of motive, providing an explanation for defendant's actions."]; *People v. Wagner* (N.Y.App.Div. 2006) 27 A.D.3d 671, 672 [811 N.Y.S.2d 125, 126] ["white supremacist tattoos were relevant as to motive and intent to commit aggravated harassment in the second degree"]; *State v. Novak* (Mo.Ct.App. 1997) 949 S.W.2d 168, 171 [defendant's " 'white pride' " tattoo admissible to show motive for killing of African-American; "[t]he judge could properly conclude that the evidentiary value outweighed the possible prejudicial effect"].)

### Sufficiency of the Evidence

■ To convict a defendant of first degree premeditated murder or attempted murder, the prosecution must establish "beyond a reasonable doubt . . . that [the defendant] acted with the specific intent to kill, and with premeditation and deliberation." (*Alcala v. Superior Court* (2008) 43 Cal.4th 1205, 1223 [78 Cal.Rptr.3d 272, 185 P.3d 708].) Appellant contends that the evidence is insufficient to establish the requisite specific intent to kill. Even if the evidence is deemed sufficient for this purpose, appellant contends that it is insufficient to establish the requisite premeditation and deliberation.

" 'When considering a challenge to the sufficiency of the evidence to support a conviction, we review the entire record in the light most favorable to the judgment to determine whether it contains substantial evidence—that is, evidence that is reasonable, credible, and of solid value—from which a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt.' [Citation.] . . . [A] reviewing court 'presumes in support of the judgment the existence of every fact the trier could reasonably deduce from the evidence.' [Citation.] 'This standard applies whether direct or circumstantial evidence is involved.' [Citation.]" (*People v. Avila* (2009) 46 Cal.4th 680, 701 [94 Cal.Rptr.3d 699, 208 P.3d 634].)

### Specific Intent to Kill

Appellant argues: "There is no evidence . . . that appellant aimed the gun at an occupant inside the vehicle intending to kill anyone in the car. A far more reasonable inference . . . is that appellant was either trying to shoot out a taillight of the vehicle or, possibly, the rear tire, in order to harass or scare the occupants inside the vehicle. Had appellant been aiming at the occupants of the vehicle, the shot would most likely have caused damage to a window or some other portion of the car in closer proximity to the passenger compartment."

Substantial evidence supports the jury's finding that appellant had the specific intent to kill rather than to merely harass or scare the occupants of

the vehicle. While traveling close behind the vehicle, appellant fired a bullet into its right taillight. Any reasonable person would have known that the taillight would not stop the bullet, which would continue to travel in the direction that the gun was pointed. Here, the gun must have been pointed in the direction of the passenger compartment; otherwise, the bullet would not have killed the passenger seated in the right backseat. Accordingly, viewing the evidence in the light most favorable to the judgment, a reasonable trier of fact could find that appellant had the requisite specific intent to kill.

■ But to uphold the attempted murder convictions, it is not enough to show that appellant intended merely to kill someone inside the Camry. It must be shown that he intended to kill each of the attempted murder victims. " 'To be guilty of attempted murder, the defendant must intend to kill the alleged victim, not someone else.' [Citation.] Whether the defendant acted with specific intent to kill 'must be judged separately as to each alleged victim.' [Citation.]" (*People v. Smith* (2005) 37 Cal.4th 733, 740 [37 Cal.Rptr.3d 163, 124 P.3d 730].) "Someone who in truth does not intend to kill a person is not guilty of that person's attempted murder even if the crime would have been murder—due to transferred intent—if the person were killed." (*People v. Bland* (2002) 28 Cal.4th 313, 328 [121 Cal.Rptr.2d 546, 48 P.3d 1107].)

Based on *People v. Smith, supra,* 37 Cal.4th 733, we have no difficulty in concluding that the evidence is sufficient to support a finding that appellant harbored a specific intent to kill Hernandez, the attempted murder victim in count 2. In *Smith* a vehicle contained three occupants. The mother of a three-month-old baby was seated in the driver's seat. The baby was seated in the backseat directly behind her. The mother's boyfriend was seated next to her in the front passenger seat. The defendant, who claimed that the mother was his ex-girlfriend, approached the vehicle and saw the baby in the backseat directly behind the mother. The defendant "fired a single shot into the vehicle from a position directly behind it and a distance of approximately one car length as [mother] was pulling away from the curb." (*Id.,* at p. 742.) The bullet "missed both the baby and the mother by a matter of inches as it shattered the rear windshield, passed through the mother's headrest, and lodged in the driver's side door." (*Id.,* at p. 743.) The defendant was convicted of the attempted murder of both the mother and the baby. Our Supreme Court rejected the defendant's contention that the evidence was insufficient to support the attempted murder conviction as to the baby. The court reasoned: "[E]vidence that defendant purposefully discharged a lethal firearm at the victims, both of whom were seated in the vehicle, one behind the other, with each directly in his line of fire, can support an inference that he acted with intent to kill both. [Citations.]" (*Ibid.*)

Just as in *Smith*, where the baby was seated directly behind the mother, here Blanco was seated directly behind Hernandez. It is reasonable to infer that appellant saw Blanco and Hernandez inside the Camry. The Camry passed Bray's truck on its right side, and appellant was seated in the truck's right front passenger seat. The evidence, therefore, supports a reasonable inference that appellant "purposefully discharged a lethal firearm at the victims [Blanco and Hernandez], both of whom were seated in the vehicle, one behind the other, with each directly in his line of fire . . . ." (*People v. Smith, supra*, 37 Cal.4th at p. 743.) Accordingly, a reasonable trier of fact could find beyond a reasonable doubt that appellant intended to kill Hernandez as well as Blanco. In *Smith* our Supreme Court noted: "[E]ven if defendant subjectively believed he had a particular reason or cause to shoot at the mother, that does not preclude a finding that he also harbored express malice toward the baby when he fired into the vehicle with both victims directly in his line of fire." (*Id.*, at p. 744.)

Our conclusion that the evidence is sufficient to support a finding of specific intent to kill Hernandez as well as Blanco is also supported by *People v. Chinchilla* (1997) 52 Cal.App.4th 683 [60 Cal.Rptr.2d 761]. "The *Chinchilla* court affirmed two convictions of attempted murder based on the firing of a single bullet at two police officers who were crouched, *one behind the other*, in the shooter's line of fire." (*People v. Smith, supra*, 37 Cal.4th at p. 744.)

On the other hand, no reasonable trier of fact could find beyond a reasonable doubt that appellant "acted with intent to kill [Rodriguez], i.e., that he purposefully shot into the vehicle with 'a deliberate intent to unlawfully take away [Rodriguez's] life' [citation] or [with] knowledge that his act of shooting into the vehicle would, ' " 'to a substantial certainty,' " ' result in [Rodriguez's] death. [Citation.]" (*People v. Smith, supra*, 37 Cal.4th at p. 743.) Appellant fired a single shot from behind the Camry into the right side of the passenger compartment, endangering the passengers seated in the right backseat (Blanco) and the front passenger seat (Hernandez). Rodriguez, who was in the driver's seat on the left side of the Camry, was out of the line of fire. It was physically impossible for the single bullet to strike Rodriguez as well as Blanco and Hernandez.

■ During closing argument, the prosecutor argued that the jury could reasonably infer that appellant intended to kill all of the occupants of the Camry because all of them were "in the kill zone." Respondent refers to this "kill zone" theory in its brief. Our Supreme Court explained the "kill zone" theory in *People v. Bland, supra*, 28 Cal.4th at page 330: "[C]onsider a defendant who intends to kill A and, in order to ensure A's death, drives by a group consisting of A, B, and C, and attacks the group with automatic

weapon fire or an explosive device devastating enough to kill everyone in the group. The defendant has intentionally created a 'kill zone' to ensure the death of his primary victim, and the trier of fact may reasonably infer from the method employed an intent to kill others concurrent with the intent to kill the primary victim. When the defendant escalated his mode of attack from a single bullet aimed at A's head to a hail of bullets or an explosive device, the factfinder can infer that, whether or not the defendant succeeded in killing A, the defendant concurrently intended to kill everyone in A's immediate vicinity to ensure A's death." "*Bland* simply recognizes that a shooter may be convicted of multiple counts of attempted murder on a 'kill zone' theory where the evidence establishes that the shooter used lethal force designed and intended to kill everyone in an area around the targeted victim (i.e., the 'kill zone') as the means of accomplishing the killing of that victim. Under such circumstances, a rational jury could conclude beyond a reasonable doubt that the shooter intended to kill not only his targeted victim, but also all others he knew were in the zone of fatal harm." (*People v. Smith, supra*, 37 Cal.4th at pp. 745–746.)

We need not determine whether appellant's firing of a single bullet at the right side of the Camry's passenger compartment created a "kill zone" within the meaning of *Bland*.[7] If it did create a "kill zone," that zone encompassed only the persons in the single bullet's line of fire: Blanco and Hernandez. A reasonable trier of fact could not find beyond a reasonable doubt that appellant's firing of a single bullet constituted "lethal force designed and intended to kill everyone" in the Camry. (*People v. Smith, supra*, 37 Cal.4th at p. 746.) The situation would have been different had appellant fired more than one shot at the Camry or had he used a shotgun. In *Bland* our Supreme Court concluded that the jury could have reasonably found that the defendant had intended to kill a car's passengers, even though his primary target was the driver, because the "defendant and his cohort fired a flurry of bullets at the fleeing car and thereby created a kill zone." (*People v. Bland, supra*, 28 Cal.4th at pp. 330–331.)

■ Accordingly, the attempted murder conviction as to Rodriguez (count 3) must be reversed because the evidence is insufficient to show that appellant harbored a specific intent to kill him. This reversal reduces appellant's sentence by 40 years: 15 years to life for attempted murder plus 25 years to life for the firearm enhancement pursuant to section 12022.53, subdivision (d).

---

[7] In *People v. Smith, supra*, 37 Cal.4th at page 746, footnote 3, our Supreme Court declined to "decide under what factual circumstances, if any, the firing of a single bullet might give rise to multiple convictions of attempted murder under *Bland*'s kill zone rationale."

*Premeditation and Deliberation*

"A verdict of deliberate and premeditated first degree murder requires more than a showing of intent to kill. [Citation.] 'Deliberation' refers to careful weighing of considerations in forming a course of action; 'premeditation' means thought over in advance. [Citations.] 'The process of premeditation and deliberation does not require any extended period of time. "The true test is not the duration of time as much as it is the extent of the reflection. Thoughts may follow each other with great rapidity and cold, calculated judgment may be arrived at quickly. . . ." [Citations.]' [Citation.]" (*People v. Koontz* (2002) 27 Cal.4th 1041, 1080 [119 Cal.Rptr.2d 859, 46 P.3d 335].)

Here, a reasonable trier of fact could conclude that, before shooting at the Camry, appellant made a cold and calculated decision to kill Blanco and anyone else in the line of fire. Appellant had a motive to kill Blanco because they were members of rival gangs, they had fought each other in juvenile camp, and they had quarreled over "Shelly." Moreover, Blanco was showing disrespect for Rivera 13 by traveling through its territory. This act of disrespect called for retaliation by appellant. The more violent the retaliation, the more appellant would raise his status in the gang. Appellant would gain maximum prestige and respect by committing a homicide.

While Bray was pursuing the Camry, appellant had the opportunity to carefully consider what course of action he would take. He used his hands to flash Rivera 13 signs so that anyone who saw him would know that he was acting for the gang's benefit. The jury could have reasonably found that appellant decided to commit a homicide both because he bore a personal grudge against Blanco and because a homicide would elevate his status within the gang more than any other retaliatory action.

*Consecutive Sentences*

"Section 669 grants the trial court broad discretion to impose consecutive sentences when a person is convicted of two or more crimes. [Citations.]" (*People v. Shaw* (2004) 122 Cal.App.4th 453, 458 [18 Cal.Rptr.3d 766].) California Rules of Court, rule 4.425(b)[8] provides: "Any circumstances in aggravation or mitigation may be considered in deciding whether to impose consecutive rather than concurrent sentences, except: [¶] (1) A fact used to impose the upper term; [¶] (2) A fact used to otherwise enhance the defendant's prison sentence; and [¶] (3) A fact that is an element of the crime may not be used to impose consecutive sentences."

Appellant contends that the trial court abused its discretion in imposing consecutive life terms on each of the two attempted murder convictions.

---

[8] All references to rules are to the California Rules of Court.

Since we are reversing the conviction for the attempted murder of Rodriguez, appellant's contention applies only to the consecutive life term for the attempted murder of Hernandez. Appellant argues that, since the murder and attempted murder convictions involved a single act rather than separate acts of violence, the sentence on the attempted murder conviction should have been concurrent.

We disagree. A trial court has discretion to impose consecutive sentences where, as here, a single act has resulted in crimes against multiple victims. For example, in *People v. Valenzuela* (1995) 40 Cal.App.4th 358 [46 Cal.Rptr.2d 715], the appellate court upheld the imposition of consecutive sentences on two counts of gross vehicular manslaughter. Both counts were based on the defendant's single act of driving a motor vehicle while intoxicated and entering an intersection against a red light. The two victims were killed when the appellant broadsided the vehicle in which they had been traveling. The court reasoned: "[Defendant's] drunk driving resulted in the death of two people, not just one. The trial court should have the discretion to make [defendant] 'pay' for both deaths." (*Id.*, at p. 365.)

Like the trial court in *Valenzuela*, the trial court here also did not abuse its discretion in imposing consecutive sentences even though the murder and attempted murder convictions were based on appellant's single act of firing his revolver at the Camry. The trial court relied on the probation report and respondent's sentencing memorandum. The probation report states: "[Appellant] . . . does not accept any responsibility for his actions and shows no remorse. [Appellant's] actions and behavior indicate he has no redeeming qualities and is a constant danger to the community." As an aggravating factor, the probation report notes that appellant was on probation when the crimes were committed. (Rule 4.421(b)(4).) Respondent's sentencing memorandum lists other aggravating factors, including the following: (1) "The manner in which the crime was carried out indicates planning, sophistication, or professionalism . . . ." (Rule 4.421(a)(8).) (2) "The defendant has engaged in violent conduct that indicates a serious danger to society . . . ." (Rule 4.421(b)(1).) The trial court specifically referred to these two aggravating factors, stating that they both "apply in this case." The court further declared: "The fact that great violence was used in this case, he was personally armed, the planning, the sophistication of the incidents, the serious danger to society that [appellant] presents should he be released again, all that argues in favor of consecutive sentencing."

Appellant correctly notes that, in imposing consecutive sentences, the trial court erroneously considered as an aggravating circumstance the fact that he had personally used a firearm. The court relied upon this fact to enhance appellant's sentences pursuant to section 12022.53, subdivision (d). Accordingly, it could not rely upon the same fact to impose consecutive sentences.

(Rule 4.425(b)(2).) But the other aggravating circumstances were properly considered by the court, and only a single aggravating circumstance is required to impose consecutive sentences. (*People v. Osband* (1996) 13 Cal.4th 622, 728–729 [55 Cal.Rptr.2d 26, 919 P.2d 640].) Therefore, the trial court's dual use of the same fact (appellant's personal use of a firearm) to impose consecutive sentences and enhancements was harmless error. (*Ibid.*) We reject appellant's contention that, in imposing consecutive sentences, the trial court erroneously considered additional facts that had been used to enhance his sentences or were elements of his crimes.

### Cruel and/or Unusual Punishment

Appellant contends that his sentence of 145 years to life constitutes cruel and/or unusual punishment in violation of the federal and state Constitutions. In view of our reversal of the attempted murder conviction as to Rodriguez, appellant's contention now applies to a sentence of 105 years to life. "We decide whether the penalty given 'is so disproportionate to the crime for which it is inflicted that it shocks the conscience and offends fundamental notions of human dignity,' thereby violating the prohibition against cruel and unusual punishment of the Eighth Amendment of the federal Constitution or against cruel or unusual punishment of article I, section 17 of the California Constitution. [Citations.]" (*People v. Cunningham* (2001) 25 Cal.4th 926, 1042 [108 Cal.Rptr.2d 291, 25 P.3d 519].)

Appellant's sentence does not shock the conscience or offend fundamental notions of human dignity. He personally and intentionally discharged a firearm in committing one offense of deliberate and premeditated murder and one offense of deliberate and premeditated attempted murder. His violent felonies are particularly egregious because they were committed for the benefit of a criminal street gang. "It was [appellant's] conduct, not his sentence, that was cruel and unusual." (*People v. Wallace* (1993) 14 Cal.App.4th 651, 666 [17 Cal.Rptr.2d 721].) In *Harmelin v. Michigan* (1991) 501 U.S. 957 [115 L.Ed.2d 836, 111 S.Ct. 2680], the United States Supreme Court concluded that a term of life without the possibility of parole for possessing more than 650 grams of cocaine did not constitute cruel and unusual punishment. It follows that, in view of appellant's far more serious, gang-related crimes of violence, his sentence passes constitutional muster.

### Abstract of Judgment

Respondent concedes that the abstract of judgment does not correctly reflect the sentence pronounced by the court. As to each of the attempted murder counts (counts 2 & 3), the trial court imposed a consecutive sentence of 15 years to life for the attempted murder plus 25 years to life for the

firearm enhancement pursuant to section 12022.53, subdivision (d). But the abstract of judgment erroneously shows that, as to each of counts 2 and 3, the trial court imposed a consecutive sentence of 25 years to life for the attempted murder plus 25 years to life for the firearm enhancement. In view of our reversal of the conviction on count 3 for the attempted murder of Rodriguez, no sentence may be imposed on that count. The abstract of judgment must be corrected to show only one attempted murder consecutive sentence: 15 years to life for the attempted murder of Hernandez (count 2) plus 25 years to life for the firearm enhancement.

### *Disposition*

The conviction for the attempted murder of Rodriguez (count 3) is reversed for insufficiency of the evidence. The reversal reduces appellant's aggregate prison term from 145 years to life to 105 years to life. The trial court is directed to amend the abstract of judgment to show only one attempted murder conviction (count 2) with a consecutive sentence of 15 years to life plus 25 years to life for the firearm enhancement. The trial court shall transmit a certified copy of the amendment to the Department of Corrections and Rehabilitation. In all other respects, the judgment is affirmed.

Gilbert, P. J., and Coffee, J., concurred.

Appellant's petition for review by the Supreme Court was denied May 12, 2010, S180766.