Filed 3/16/26  P. v. Schmittel CA4/1

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>CHRISTOPHER RAY SCHMITTEL,<br><br>    Defendant and Appellant. | D085009<br><br><br>(Super. Ct. No. SCD294597) |

APPEAL from a judgment of the Superior Court of San Diego County, Lisa R. Rodriguez, Judge.  Affirmed.

Jones Trial Attorneys and Sean M. Jones, for Defendant and Appellant.

Rob Bonta, Attorney General, Charles C. Ragland, Chief Assistant Attorney General, Cristopher P. Beesley, Namita Patel and Cobi Furdek, Deputy Attorneys General for Plaintiff and Respondent.

In April 2022, 19-year-old Christopher Ray Schmittel, under the influence of alcohol and drugs, drove at speeds over 125 miles per hour on the wrong side of North Torrey Pines Road and crashed into the center divider. Schmittel lost control, and the car launched through a guardrail and rolled

down an embankment onto the beach over 20 feet below. Two of his passengers, friends Joshua Manjarrez and Johnny Punzalan, died as a result, and the two others in the car were seriously injured. Among other charges, a jury convicted Schmittel of two counts of second degree murder, and the court sentenced him to 30 years to life, plus two years, in state prison.

On appeal, Schmittel asserts there was insufficient evidence to sustain his two convictions of implied malice murder, arguing the prosecution failed to establish his subjective awareness of the risk that his conduct created. Additionally, he claims the trial court erred by sentencing him consecutively for the two murder counts rather than concurrently. As we shall explain, we reject these arguments and affirm the judgment of conviction.

FACTUAL AND PROCEDURAL BACKGROUND

On April 25, 2022, Schmittel and his four friends, Manjarrez, Punzalan, Aaron McCray, and Adrian Garcia gathered at Garcia's house in the late afternoon. There, Schmittel smoked marijuana and took half of a Xanax pill. The group decided to go to the beach to drink and take psychedelic mushrooms.

Around 6:30 p.m., the group got into Schmittel's manual transmission Subaru WRX with Schmittel driving—of the five young men only Schmittel and Garcia knew how to use a manual transmission. Shortly after leaving Garcia's house in Lake Elsinore, Schmittel stopped along the Ortega Highway at a sandwich shop and purchased a chocolate bar laced with psychedelic mushrooms. Schmittel stopped a second time at a liquor store where Punzalan asked someone he knew to purchase two tall cans of 4-Lokos for them. 4-Lokos is an alcoholic beverage with an alcohol-by-volume percentage of 13.9%.

2

The group traveled down Ortega Highway towards Orange County with Schmittel behind the wheel. As he drove, Schmittel shared one of the 4-Lokos cans with Garcia, who was seated in the front passenger seat. Ortega Highway is a mountainous, windy road with one lane in each direction. The speed limits are generally around 40 miles per hour or less. Signs advising of the speed limits and warning of sharp curves line the road. Parts of the roadway have a natural cliff and there are areas on the road without a shoulder.

As Schmittel drove west on Ortega Highway, he approached speeds of 120 miles per hour. He crossed into oncoming traffic, causing some cars to move out of the way. Schmittel's surviving passengers testified that several times, he came within one to two car lengths of oncoming cars at high speeds. In addition to drinking while driving, Schmittel also took his hands entirely off the steering wheel and put them through the sunroof, sometimes removing his hands from the wheel as he was encountering oncoming traffic. On a video taken by McCray, Schmittel's friends discussed that he was driving 115 miles per hour on the winding, two-lane road.

Schmittel then entered Interstate-5 South, where he drove up to 140 miles per hour weaving through traffic. McCray testified Schmittel was driving so fast that McCray could not tell if other cars had to move out of the way to avoid them. McCray took several cell phone videos while they were driving on I-5, which showed brake lights turning on for cars in front of Schmittel and Schmittel's speed going up to 132 miles per hour.[1]

The group pulled over at a gas station in Oceanside where Manjarrez stole two cases of hard seltzer, which has an alcohol-by-volume percentage of

---

[1] Manjarrez also took several videos of the drive, which he posted to Instagram that day.

3

approximately 5%.  Schmittel then continued driving until they arrived at a beach in Del Mar.  There, the group drank the hard seltzers.  Schmittel consumed two or three seltzers and ate a portion of the psychedelic mushroom chocolate bar.  About an hour after they arrived, the group got back in Schmittel's car.  Garcia asked Schmittel if he was okay to drive and Schmittel testified he decided to drive because Garcia was also drinking, and Schmittel "felt more confident in [him]self to drive."

Schmittel drove south on North Torrey Pines Road.  As the road reaches Torrey Pines State Beach it has two lanes in each direction, divided by two sets of double yellow lines with space between.  Near the point of the crash, the empty space becomes a raised island, separating the Northbound and Southbound lanes.  Investigators determined based on evidence at the scene of the crash, that as Schmittel sped down North Torrey Pines Road, he entered the oncoming Northbound lane of traffic.  The records from the event data recorder in Schmittel's car showed that in the moments prior to losing control, Schmittel pushed the car's accelerator as far as it would go, reaching speeds over 125 miles per hour, and that he never touched the car's brakes.  As Schmittel crossed back into the Southbound lane, he struck the curb of the raised island.  His car ricocheted into the bike lane, tore through the guardrail, and rolled down an embankment before landing on the beach below.

Responding officers arrived on scene shortly after 11:00 p.m. and observed vehicle debris scattered on the roadway and across the embankment and beach where the car came to a final stop, 20 feet below the road's guardrail.  Schmittel and Garcia were in the sand on the driver's side of the car.  Punzalan's and Manjarrez's bodies were lying on the ground outside the car.  McCray was still inside the car sitting belted in the middle rear seat.

4

The car was found "rolled over [and] mangled." Multiple airbags had deployed.

After the collision, Garcia called 911. A recording of his call was played for the jury. Garcia suffered a brief loss of consciousness, a concussion, and lost his memory about the events immediately after the collision. Garcia and McCray, who had to be extricated from the car by firefighters, suffered extensive injuries as a result of the crash. The other rear passengers, Manjarrez and Punzalan, were thrown out of the car and pronounced dead at the scene. The cause of death for both men was multiple blunt force injuries caused by the collision and their ejection from the car during the collision.

Schmittel suffered a concussion, broke his back in four places, crushed his aorta, and lacerated his spleen. During the investigation, he admitted consuming one or two hard seltzers and that the collision was his fault. The lead traffic investigating officer at the scene noticed Schmittel had slightly red, watery, and dilated eyes and the smell of alcohol on his breath. This led the officer to believe Schmittel was under the influence of either a controlled substance or both a controlled substance and alcohol.

Schmittel, who testified in his own defense, told the jury that before the crash he was driving over 100 miles per hour in a 40 miles per hour zone, which he was aware was illegal and that he knew a collision at that speed could be fatal. Schmittel also stated he knew that crossing the double yellow lines into oncoming traffic was illegal and could result in a fatal collision. He stated he was aware that drinking or having drugs in his system while driving was dangerous, against the law, and could cause a fatal collision. Because of this, Schmittel had taken ride shares in the past, stayed at people's homes to become sober before driving, and advised a friend not to drink and drive just two weeks prior to the collision.

5

Schmittel also told the jury that he had worked at two different drug and alcohol rehabilitation centers in the past. Schmittel was also an experienced driver. He raced motorcross professionally and had spent hours at various racetracks in cars with professional drivers. He testified that he was very familiar with Ortega Highway and admitted his driving that day on the road was dangerous and reckless. Schmittel also admitted that on the drive on North Torrey Pines Road before the crash he intentionally crossed into oncoming traffic lanes for fun and did not pay attention to the signs warning him of the speeds, even though he initially denied speeding when he spoke with the responding and investigating police officers.

A forensic toxicologist confirmed Schmittel had alcohol in his system and determined that if it was fully absorbed, he would have consumed approximately 3.5 to 4 drinks and had a blood alcohol level concentration between 0.07 to 0.09% at the time of the crash. Blood testing from draws taken by hospital staff and again later by a phlebotomist revealed Schmittel had alprazolam, cannabinoids, and benzodiazepines in his system.

Schmittel was arrested and eventually convicted by the jury of two counts of murder (Pen. Code, § 187, subd. (a); counts 1 and 2), two counts of gross vehicular manslaughter while intoxicated (*id.*, § 191.5, subds. (a), (c); counts 3 and 4), two counts of driving under the influence of alcohol or drugs causing injury (Veh. Code, § 23153, subds. (a), (b); counts 6 and 7), driving with a measurable blood alcohol causing injury (*id.*, § 23153, subd. (g); count 5), driving the wrong way on a divided highway (*id.*, § 21651, subd. (b); count 8), and being a person under age 21 while driving with 0.05% blood alcohol level (*id.*, § 23140, subd. (a); count 9). As to the drunk driving offenses, the jury found that Schmittel personally inflicted great bodily injury upon McCray under Penal Code section 12022.7, subdivision (a). Before

6

sentencing, Schmittel admitted the aggravating factor that he drove twice or more the posted speed limit at the time of the event, and the prosecution dismissed two additional aggravating factors charged against him..  (Cal. Rules of Court, rule 4.408(a).)

The trial court sentenced Schmittel to 30 years to life plus two years in state prison, consisting of two consecutive 15-years-to-life terms for each murder conviction and a consecutive two-year term for the violation of Vehicle Code section 23153, subdivision (g).  The court imposed and stayed sentences for counts 3, 4, 6, 7 and 9, and imposed a concurrent 90-day term for count 8.  Schmittel timely appealed from the judgment of conviction.

DISCUSSION

I

*Sufficient Evidence Supported the Jury's Verdict of Implied Malice*

A

*Second-Degree Murder*

A defendant is guilty of second degree murder where the evidence demonstrates a killing was done without premeditation and deliberation. (Pen. Code, §§ 187, 189.)  To prove a defendant is guilty of this offense, the prosecution "is required to prove beyond a reasonable doubt" that "(1) the defendant committed an act that caused the death of another person; (2) when the defendant acted, he had a state of mind called malice aforethought; and (3) he killed without lawful excuse or justification."  (*People v. Navarette* (2016) 4 Cal.App.5th 829, 843.)  "The element of malice aforethought, moreover, encompasses two alternative mental states, express malice and implied malice, which must be formed before the act that causes death is committed.  (CALCRIM No. 520.)  A defendant acted with express malice if he unlawfully intended to kill, and with implied malice if he

7

(1) intentionally committed an act; (2) the natural and probable consequences of the act were dangerous to human life; (3) at the time he acted, he knew his act was dangerous to human life; and (4) he deliberately acted with conscious disregard for human life." (*Navarette,* at pp. 843–844.)

Stated differently, implied malice exists where a person, knowing that his conduct endangers the life of another, still acts deliberately with conscious disregard for human life. (*People v. Sedeno* (1974) 10 Cal.3d 703, 722–723, disapproved on another ground in *People v. Breverman* (1998) 19 Cal.4th 142, 176.) "Phrased in everyday language, the state of mind of a person who acts with conscious disregard for life is, 'I know my conduct is dangerous to others, but I don't care if someone is hurt or killed.' " (*People v. Olivas* (1985) 172 Cal.App.3d 984, 987–988.) It is not enough that a reasonable person would have been aware of the risk; the facts must demonstrate that the defendant was subjectively aware of the risk. (*People v. Watson* (1981) 30 Cal.3d 290, 296 (*Watson*); *People v. Carr* (2023) 90 Cal.App.5th 136, 143.)

The circumstances surrounding a defendant's actions may reveal implied malice even if those actions lead to an accidental death. (*People v. Nieto Benitez* (1992) 4 Cal.4th 91, 110; *People v. Contreras* (1994) 26 Cal.App.4th 944, 954.) Thus, as the reviewing court, we must consider the circumstances preceding the victims' deaths to determine the existence of implied malice. (*Nieto Benitez,* at p. 107.)

B

*Standard of Review*

"In reviewing a sufficiency of evidence claim, the reviewing court's role is a limited one. ' "The proper test for determining a claim of insufficiency of evidence in a criminal case is whether, on the entire record, a rational trier of

8

fact could find the defendant guilty beyond a reasonable doubt." ' " (*People v. Smith* (2005) 37 Cal.4th 733, 738–739.)  This court "evaluate[s] the whole record in the light most favorable to the judgment to determine whether it discloses substantial evidence—evidence that is reasonable, credible, and of solid value—from which a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt." (*People v. Ramos* (2016) 244 Cal.App.4th 99, 104.)  We do not "reweigh the evidence; the credibility of witnesses and the weight to be accorded to the evidence are matters exclusively within the province of the trier of fact." (*People v. Stewart* (2000) 77 Cal.App.4th 785, 790.)

Further, we must presume in support of the judgment every fact that could reasonably be deduced from the evidence (*People v. Kraft* (2000) 23 Cal.4th 978, 1035) and disregard any evidence that does not support the judgment as having been rejected by the trier of fact for lack of sufficient veracity (*People v. Ryan* (1999) 76 Cal.App.4th 1304, 1316).  If the circumstances reasonably justify the findings made by the trier of fact, reversal of the judgment is not warranted simply because the circumstances might also reasonably be reconciled with a contrary finding.  (*People v. Covarrubias* (2016) 1 Cal.5th 838, 890.)

C

*Analysis*

Schmittel accepts liability for gross vehicular manslaughter, but on appeal argues the evidence was insufficient to support the jury's finding of implied malice.  Specifically, he asserts there was no evidence that "he *actually* appreciated the risk involved at the time of the accident."  The evidence at trial, however, clearly supported the jury's conclusion that

9

Schmittel did appreciate the risks of his actions, and decided to drive under the influence of drugs and alcohol and in a manner dangerous to life anyway.

In *Watson*, the Supreme Court considered whether a homicide caused by a drunk driver could be prosecuted as a second degree murder under a theory of implied malice. The court held that "when the conduct in question can be characterized as a wanton disregard for life, and the facts demonstrate a subjective awareness of the risk created, malice may be implied. [Citation.] In such cases, a murder charge is appropriate." (*Watson, supra*, 30 Cal. 3d at p. 298.) The *Watson* court cautioned, however, that "we neither contemplate nor encourage the routine charging of second degree murder in vehicular homicide cases." (*Id*. at p. 301.)

In *Watson*, the defendant had consumed enough alcohol to become legally intoxicated. He "had driven his car to the establishment where he had been drinking, and he must have known that he would have to drive it later." (*Watson, supra*, 30 Cal.3d at p. 300.) Although the court presumed that the defendant was generally "aware of the hazards of driving while intoxicated," it did not suggest that this fact alone would suffice to sustain a charge of murder. (*Ibid*.) Instead, the court emphasized other evidence that could support a finding of implied malice, including that the "[d]efendant drove at highly excessive speeds through city streets, an act presenting a great risk of harm or death. Defendant nearly collided with a vehicle after running a red light; he avoided the accident only by skidding to a stop. He thereafter resumed his excessive speed before colliding with the victims' car, and then belatedly again attempted to brake his car before the collision (as evidenced by the extensive skid marks before and after impact) suggesting an actual awareness of the great risk of harm which he had created." (*Id*. at p. 301.)

10

The court concluded that, "[i]n combination, these facts reasonably and readily support a conclusion that defendant acted wantonly and with a conscious disregard for human life." (*Watson, supra,* 30 Cal.3d at p. 301.) Following *Watson*, the Courts of Appeal have upheld convictions for murder involving fatal intoxicated driving accidents. (See *People v. Wolfe* (2018) 20 Cal.App.5th 673, 682–683 [citing cases].) In general, "these opinions 'have relied on some or all of the following factors' that were present in *Watson*: '(1) blood-alcohol level above the .08 percent legal limit; (2) a predrinking intent to drive; (3) knowledge of the hazards of driving while intoxicated; and (4) highly dangerous driving.' " (*Ibid.*; see *People v. Talamantes* (1992) 11 Cal.App.4th 968, 973.)

Here, *all of* the factors identified by the *Watson* court are present. When Schmittel decided to drive his group of friends with alcohol and drugs in his system, he admittedly knew the substances could impair his ability to safely drive and that this was unlawful. He also had experience working at two different drug and alcohol addiction rehabilitation centers. Schmittel had taken steps in the past to avoid driving after drinking and had even warned a friend just two weeks prior not to drive after drinking.

Further, and critically, Schmittel acknowledged knowing the hazards of driving recklessly at extraordinarily high speed. He knew that driving 100 miles per hour or more in a 40 mile per hour zone is against the law and testified that he knew a car crash at that speed could be fatal. Likewise, he told the jury he was aware that crossing double yellow lines into an oncoming traffic and driving in an oncoming traffic lane was both against the law and dangerous. He testified that he knew that a head-on collision could be fatal and that his driving was dangerous to human life.

Despite this admitted knowledge, Schmittel drove recklessly with drugs and alcohol in his system, endangering the lives of his friends and others. He sped over 100 miles per hour on roads with speed limits of 35 or 40 miles per hour, ignored all traffic signs, and crossed over double yellow lines into oncoming traffic, forcing other cars to move out of the way to avoid him. After consuming more alcohol and psychedelic mushrooms, Schmittel continued to drive in the same extremely reckless manner culminating in a crash leading to the deaths of two of his friends. These facts constituted sufficient evidence to support the jury's finding of implied malice. (See *People v. McCarnes* (1986) 179 Cal.App.3d 525, 535 [the defendant's pattern of reckless high speed passing maneuvers on two-lane roads and repeatedly and deliberately driving into oncoming traffic amply showed his awareness that his conduct was dangerous].)

In his briefing, Schmittel points to the dissent in *Watson* and argues the prosecution failed to prove that he was subjectively aware of the risks he posed. As the Attorney General points out, the *Watson* dissent does not constitute law we are bound to follow. However, even if we consider the argument, the dissent does not aid Schmittel. The dissent criticized the *Watson* majority for not considering testimony that the defendant was actually driving at slower speeds and that the light was green before a fatal collision occurred. (*Watson, supra*, 30 Cal.3d at p. 302–303 (dis. opn. of Bird, C.J.).) The dissent further concluded that the fact the defendant drove to a bar and drank several hours before the collision did not justify an inference of a conscious disregard for human life and that defendant's prior drinking was not evidence of his state of mind at the time of the accident. (*Id*. at pp. 305–306.)

In contrast to the facts in *Watson*, there is no question that the evidence here showed Schmittel subjectively appreciated the risks of his conduct. Schmittel was aware drinking and using drugs could impair his driving abilities and endanger others, and he knew that high speeds, up to three times the speed limit, and dangerous driving maneuvers could result in a fatal crash. Despite this prior knowledge, Schmittel decided to drive after using marijuana and Xanax, and knowing that he would drink alcohol and consume psychedelic mushrooms before driving home. He was also aware that cars had to move out of his way as he entered oncoming lanes of traffic at high speed. Schmittel also knew that he was driving his friends in his manual transmission car and only one other person in the group, who was also drinking, knew how to drive it.

This evidence amply demonstrated Schmittel was aware of the risks and consciously chose to ignore them. Schmittel's assertion that the evidence showed only a group of teenagers having fun, and that he was ignorant of the danger posed by his conduct, is not an accurate or complete representation of the evidence presented to the jury.[2]

---

[2] Schmittel also argues the facts here should be distinguished from *People v. David* (1991) 230 Cal.App.3d 1109 (*David*) and *People v. Goecke* (1998) 457 Mich. 442 (*Goecke*), cases upholding implied malice murder convictions. We disagree. In *David*, the defendant was under the influence of PCP and had two prior accidents on the drug that resulted in criminal convictions. (*David,* at p. 1115.) On the night of the crimes at issue, he deliberately obtained the keys to his mother's car while intoxicated on PCP. (*Ibid*.) While driving, before causing a fatal collision that killed two victims, the defendant had crossed the double-yellow center lines into oncoming traffic, forced other cars out of their lanes to avoid him, and nearly collided with a woman and her two children in a crosswalk. (*Id*. at p. 1116.) The court held the pattern of David's driving showed his awareness of his surroundings and the "trier of fact could infer appellant's awareness of the risk from the distance he drove." (*Id*. at p. 1116.)

Schmittel also argues that the prosecutor's closing argument improperly led the jury to consider only what risk a reasonable person would have appreciated at the time of the collision, not what Schmittel actually appreciated. Not so. The prosecutor spent a significant portion of her argument discussing what Schmittel personally and subjectively knew and explaining the choices he made. Directly after she used the term "reasonable person," the prosecutor stated clearly, "And we're talking about more than just common sense. Everyone knows that driving at high speeds generally is unsafe. Everyone knows that driving under the influence is unsafe. But we're talking about the defendant's specific, specialized, highly technical knowledge."

She then further focused on Schmittel's own knowledge, highlighting his statement that "he knew specifically and admitted to you that a crash at 100 miles per hour could be fatal. He admitted to you that he knew a head-on collision in an oncoming lane of traffic could be fatal." The prosecutor also

---

In *Goecke, supra*, 457 Mich. at p. 470, the defendant drove at high speeds on main streets, evading police, after they discovered him drinking in the parking lot of a liquor store. While he was being pursued, the defendant narrowly missed hitting another car and sped through at least one red traffic light before striking the victim's car. (*Ibid*.) After the accident, the defendant stated he was aware he drove too fast, admitted fault for the accident, and said he knew he should not have driven. (*Id*. at pp. 470–471.) Based on this, the court found sufficient evidence to proceed to trial on a murder charge. (*Id*. at p. 471.)

As in *David* and *Goecke*, the evidence here supported the jury's finding of implied malice. Although he did not have a criminal record of driving while intoxicated, Schmittel knew that he had already consumed drugs and had plans to drink alcohol and consume more drugs before driving home. Like *David*, Schmittel drove his car recklessly prior to the collision, speeding, driving over double yellow lines and into oncoming traffic, causing others to move out of the way. Further, he admitted he drove recklessly for fun. If anything, these two cases support the jury's conclusion that Schmittel had actual, subjective knowledge of the risks of his behavior.

14

pointed to Schmittel's personal knowledge of driving under the influence of alcohol and drugs, including working at two drug and alcohol rehabilitation centers, his various admissions about the dangers of driving under the influence, and his own actions to avoid doing so in the past.

Throughout her closing argument, the prosecutor was clear that Schmittel himself knew the risks of driving under the influence and the risks of reckless driving, but chose to disregard those risks over the course of the night, culminating in the fatal collision killing two of his close friends. In sum, the evidence before the jury sufficiently supported its finding that Schmittel knew his reckless driving, while intoxicated with alcohol and drugs, was dangerous to human life.

II

*The Trial Court Did Not Err by Imposing Consecutive Sentences*

Schmittel also asserts that the trial court abused its discretion by imposing two sentences of 15 years to life for each murder conviction consecutively, rather than concurrently. The Attorney General responds that the discretionary choice was proper, and Schmittel has shown no error on appeal. We agree with the Attorney General.

" '[Penal Code] [s]ection 669 grants the trial court broad discretion to impose consecutive sentences when a person is convicted of two or more crimes.' " (*People v. Leon* (2010) 181 Cal.App.4th 452, 467 (*Leon*).) California Rules of Court, rule 4.425(a) sets forth factors the court may use in deciding whether to impose consecutive rather than concurrent terms. These factors include whether: "(1) The crimes and their objectives were predominantly independent of each other; (2) The crimes involved separate acts of violence or threats of violence; and (3) The crimes were committed at different times or separate places, rather than being committed so closely in time and place

15

as to indicate a single period of aberrant behavior." (Cal. Rules of Court, rule 4.425(a).) Further, rule 4.425(b) provides, in part: "Any circumstances in aggravation or mitigation may be considered in deciding whether to impose consecutive rather than concurrent sentences," but "[a] fact that is an element of the crime may not be used as an aggravating factor." (See Cal. Rules of Court, rules 4.421 and 4.423 [listing circumstances in aggravation or mitigation, respectively].)

In addition to the factors set forth in the Rules of Court, "a trial court has discretion to impose consecutive sentences where ... a single act has resulted in crimes against multiple victims." (*Leon, supra*, 181 Cal.App.4th at p. 468.) " 'A defendant who commits an act of violence with the intent to harm more than one person or by a means likely to cause harm to several persons is more culpable than a defendant who harms only one person. For example, a defendant who chooses a means of murder that places a planeload of passengers in danger, or results in injury to many persons, is properly subject to greater punishment than a defendant who chooses a means that harms only a single person.' "[3] (*People v. Oates* (2004) 32 Cal.4th 1048, 1063.)

Here, the record shows the trial court relied on a valid factor to impose consecutive sentences. (See *People v. Cruz* (1995) 38 Cal.App.4th 427, 433–434 ["A single factor in aggravation will support imposition of an upper term].) At the sentencing hearing, the court explained that "two different 19-year-olds lost their lives and another victim was significantly injured." This factor justified consecutive sentencing, and Schmittel has not shown the court's reasoning was arbitrary or irrational.

---

[3] Indeed, Schmittel's brief cites *Leon* and explicitly "acknowledges that the courts have held that a trial court has discretion to 'impose consecutive sentences where … a single act resulted in crimes against multiple victims.' "

While a court may choose to impose concurrent sentences in cases involving multiple fatalities resulting from driving under the influence, this reflects only a discretionary decision by the sentencing court and does not establish the trial court's decision here to impose consecutive sentences was an abuse of discretion. Schmittel's citation to other cases where the court imposed concurrent sentences does not establish any error in this case; only different discretionary choices in different factual circumstances. Indeed, the cases he cites do not even address the sentences imposed, let alone discuss what sentencing factors led to the imposition of concurrent sentences when multiple deaths occurred. (See *People v. Watson* (1983) 150 Cal.App.3d 313, 316–320 [reversing trial court's order granting motion for new trial and reducing jury's verdict from second degree murder to vehicular manslaughter; no consideration of sentence imposing concurrent terms on manslaughter convictions]; *People v. Murphy* (2022) 80 Cal.App.5th 713, 724 [imposing three concurrent terms of 15 years to life in prison for second degree murder convictions and containing no discussion of the unchallenged sentence]; *David, supra*, 230 Cal.App.3d at p. 1111 [imposing two concurrent terms of 15 years to life in prison for second degree murder convictions and containing no discussion of the unchallenged sentence].) The court's imposition of consecutive sentences in this case recognized the individuality and gravity of each loss and did not constitute an abuse of the court's sentencing discretion.

## DISPOSITION

The judgment is affirmed.

McCONNELL, P. J.

WE CONCUR:

DATO, J.

KELETY, J.