Filed 4/6/16  P. v. Delgado CA3

<u>NOT</u> <u>TO</u> <u>BE</u> <u>PUBLISHED</u>

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Sacramento)

----

| | |
|---|---|
| THE PEOPLE, | |
| Plaintiff and Respondent, | C071439 |
| v. | (Super. Ct. No. 11F01402) |
| FRANCISCO IGNACIO DELGADO et al., | ORDER MODIFYING OPINION AND DENYING PETITION FOR REHEARING |
| Defendants and Appellants. | [NO CHANGE IN JUDGMENT] |

THE COURT:

The opinion filed March 17, 2016, in the above cause is modified in the following respects:

Delete the first paragraph appearing at the top of page 22 and replace it with the following paragraph:

The evidence regarding Isidro-Ausencio's gang moniker was not merely cumulative, as he suggests.  Several of the witnesses knew Isidro-Ausencio by his gang moniker, "Sniper."  The investigation of the shooter was based on information that "Sniper" was connected to the murders.  Moreover, the gang moniker was relevant as to motive and intent for the

1

murders as well as to the charged gang enhancements. Even so, this evidence took up little time during trial. In short, the evidence of Isidro-Ausencio's gang moniker was highly relevant and not unduly prejudicial.

This modification does not change the judgment.

Appellant Isidro-Ausencio's petition for rehearing is denied.


_____/s/_____,
BUTZ, Acting P.J.


_____/s/_____,
MAURO, J.


_____/s/_____,
HOCH, J.

Filed 3/17/16  P. v. Delgado CA3 (unmodified version)

<u>NOT</u> <u>TO</u> <u>BE</u> PUBLISHED

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Sacramento)

----

| | |
|---|---|
| THE PEOPLE, | |
| Plaintiff and Respondent, | C071439 |
| v. | (Super. Ct. No. 11F01402) |
| FRANCISCO IGNACIO DELGADO et al., | |
| Defendants and Appellants. | |

A trial involving separate juries culminated in the convictions of defendants Francisco Ignacio Delgado and Saul Isidro-Ausencio for murdering three teenagers during a drive-by shooting.  Isidro-Ausencio's jury found him guilty of three counts of first degree murder (Pen. Code, § 187, subd. (a))[1] and found true the allegations of discharging a firearm from a motor vehicle, multiple murders, and personal discharge of a firearm causing death (§§ 190.2, subds. (a)(3) & (a)(21), 12022.5, subd. (a), 12022.53, subds. (b)-(e)).  Isidro-Ausencio's jury further found he committed the murders for the

---

[1]     Undesignated statutory references are to the Penal Code.

1

benefit of the Sureño criminal street gang. (§ 186.22, subd. (b)(1).) The trial court sentenced Isidro-Ausencio to serve three consecutive terms of life in prison without the possibility of parole plus 75 years to life for the firearm enhancements in addition to 16 years and 8 months for the gang enhancements.

Isidro-Ausencio contends (1) evidence of his gang moniker "Sniper" should have been excluded as unduly prejudicial, (2) photographs of him with his family should have been admitted as evidence of his good character, (3) the trial court erred in refusing his request to modify the circumstantial evidence jury instructions, (4) his jury should have been instructed on the lesser included offense of voluntary manslaughter, (5) denial of his motion for a continuance of trial violated his federal and state due process rights, (6) the cumulative impact of his claimed errors aggregate to reversible prejudice, and (7) the consecutive gang enhancements must be stricken.

We conclude the trial court did not err in admitting evidence of Isidro-Ausencio's gang moniker because it was directly relevant to the issue of his identity as the shooter. Isidro-Ausencio's family photographs, by contrast, were properly excluded because they were not relevant. The trial court properly instructed the jury on circumstantial evidence with the standard CALCRIM instructions. The trial court correctly refused to instruct on the offense of voluntary manslaughter because the heat of passion defense was inapplicable for lack of any evidence showing provocation by the murder victims. The trial court did not abuse its discretion in denying a continuance based on speculation by Isidro-Ausencio's trial attorney that additional exculpatory evidence might be found. For lack of error, there was no prejudice to cumulate and require reversal of Isidro-Ausencio's convictions. As to the gang enhancements, we conclude the trial court erred in imposing the 10-year sentence enhancement under section 186.22, subdivision (b)(1), for each of Isidro-Ausencio's special circumstance murders.

2

Accordingly, we modify the judgment as to Isidro-Ausencioto to strike the 10-year enhancements imposed under section 186.22, subdivision (b)(1). As modified, we affirm Isidro-Ausencio's judgment.

Delgado's jury found him guilty of three counts of first degree murder (§ 187, subd. (a)) and found true the allegations of discharging a firearm from a motor vehicle and multiple murders (§ 190.2, subds. (a)(3) & (a)(21)). The trial court sentenced Delgado to serve three consecutive terms of life in prison without the possibility of parole.

On appeal, Delgado contends his confession should have been suppressed because he did not knowingly and intelligently waive his *Miranda* rights.[2] We reject Delgado's challenge to the admission of his statements to the police. Substantial evidence supports the trial court's finding Delgado demonstrated sufficient command of the Spanish language to refute his claims of defective waiver of his *Miranda* rights. We affirm the judgment as to Delgado.

FACTUAL AND PROCEDURAL HISTORY

***Prosecution Evidence***

In the afternoon of February 13, 2011, Ethan Amavizca watched as three African-American males beat up Isidro-Ausencio at the entrance gate to an apartment complex where Isidro-Ausencio and Delgado lived. The assault on Isidro-Ausencio lasted approximately 40 to 50 seconds. Isidro-Ausencio got up from the ground and ran into his apartment. While fleeing, Isidro-Ausencio dropped his cell phone. Amavizca picked up the cell phone and kept it for a short time before turning it over to the police.

The three males who assaulted Isidro-Ausencio ran to their sport-utility vehicle (SUV) and began driving away at high speed when Isidro-Ausencio came back onto the

---

[2]   *Miranda v. Arizona* (1966) 384 U.S. 436 [16 L.Ed.2d 694] (*Miranda*).

3

scene with an AK-47 assault rifle. Isidro-Ausencio said, "putas" -- which means "bitch in Spanish."

Dr. James Malone was filling gasoline into a rental car when he saw Isidro-Ausencio emerge from the apartment complex, aim an assault rifle toward the SUV, and attempt to fire the weapon. Dr. Malone had served three tours of duty in war zones in the United States Army Reserve and is "very familiar with weapons and handling of weapons and use of weapons." It appeared to Dr. Malone the assault rifle jammed on Isidro-Ausencio. Isidro-Ausencio took about five seconds to clear the rifle before firing three or four shots at the SUV. Dr. Malone observed Isidro-Ausencio "[s]eemed very focused, but calm, not flustered at all." Dr. Malone further testified that "he seemed very calm to me, actually. I took note of that, somewhat surprising."

Isidro-Ausencio ran back into the apartment complex. Shortly thereafter a two-door vehicle "pulled out at a rapid rate of speed from the parking lot in a very similar fashion that the SUV did, really high rate of speed . . . ." Isidro-Ausencio was in the car with the AK-47. A young Hispanic male was in the passenger's seat. Dr. Malone reported the incident to the police and picked out two individuals from a "six-pack" photo lineup. The individual Dr. Malone identified as most likely to be the shooter was Isidro-Ausencio.

Shortly thereafter, Danielle Jamison was unloading groceries and her children from her car in front of her house -- which was located about eight miles from the apartment complex where Isidro-Ausencio had been beaten. Jamison noticed three boys -- later identified as Jamir Miller, Richard Ward, and Robert Corpos -- riding by on their bicycles. Jamison saw a Saturn car pull up alongside the three boys. Since it was a warm day for February, Jamison "thought they were young boys in the car playing with the water gun because I saw the car pull up as if they were going to wet them with water." The car pulled diagonally in front of the three boys, and one of the car's passengers pulled out a big black gun. Jamison heard three gunshots. She saw one of the boys, who

4

had ridden onto the grass of her property, fall down. She saw another boy fall to the ground in the street. After Jamison fled into her house, she looked out to see the third boy on his knees in the grass. She then observed that the Saturn pulled away "[v]ery nonchalantly, just drove off." Jamison thought there were either three people in the car or two people and a hat that looked like a person. The people in the car appeared to be very young and either Hispanic or Caucasian.

Jamison ran back outside where she found a boy in the grass screaming, "You got to help us." The second boy had made his way to the neighbor's garage where he was moaning, "help, help." The boy in the street never moved. Jamison and her husband immediately called the police.

A few minutes after the shooting, James Montgomery saw a dark green Saturn run a stop sign on the street where the three boys had been shot. When Montgomery saw the three young males lying in and near the street, he thought they had been run over by the Saturn. Montgomery was a frequent visitor to the apartment complex at which Delgado and Isidro-Ausencio lived, and Montgomery recognized the Saturn as belonging to one of the residents at the complex. Every day, Montgomery saw the Hispanic driver of the Saturn drop off another Hispanic male who lived in the apartment complex.

Richard Ward was pronounced dead at the scene. Robert Corpos and Jamir Miller died shortly thereafter at the hospital. All three died of gunshot wounds inflicted by high-velocity ammunition. No casings were found at the scene. Behind a tree, the police found a .44 caliber revolver handgun with six live rounds that had been removed by a bystander after the three victims had been shot. The revolver had been dropped by one of the victims as he attempted to run for cover when the shooting started. The murder weapon, however, was never recovered. Amavizca testified that none of the three assailants who had beaten up Isidro-Ausencio at the apartment complex was Jamir Miller, Richard Ward, or Robert Corpos.

Sacramento County Sheriff's Department Detective Paul Belli responded to the scene of the shooting. Based on the information Belli received at the scene, he began a search for a green Saturn. Further investigation led to a connection between the car and an Hispanic male with a gang moniker, Sniper. Belli also learned of a telephone number connected to a person known by the police as Sniper. The telephone number was tied to the cell phone dropped by Isidro-Ausencio at the time of the shooting and picked up by Amavizca. Sniper was the gang moniker used by Isidro-Ausencio.

After the shootings, callers to the police department also identified the suspect and another gang member, Jonathan Cruz, who was known by the gang moniker "Shrek." Cruz and Isidro-Ausencio look quite similar. When Detective Belli looked at the cell phone recovered by Amavizca from the shooter, he saw it contained photos of a person who resembled both Cruz and Isidro-Ausencio. However, when shown a photographic lineup, Amavizca immediately identified Isidro-Ausencio as the person who had gotten beaten up before retrieving the AK-47 and shooting at the departing SUV.

On February 19, 2011, the police seized the green Saturn and searched the apartment in which Isidro-Ausencio lived. Isidro-Ausencio frequently borrowed the green Saturn from his brother, to whom it belonged.

Isidro-Ausencio lived with his fiancée, Tatyana Kolosova, his young son, Kolosova's sister and her sister's boyfriend, Anthony Velasco. Kolosova only knew Velasco by the gang moniker "Cartoon."[3]

In a drawer in the bedroom shared by Isidro-Ausencio and Kolosova, the police found bullets matching the same caliber (7.62 by 39 millimeters) used to murder the three victims. Detective Belli testified that Kolosova told him Isidro-Ausencio used to keep a "large black rifle that he had stored at the apartment wrapped up in a black blanket. And

---

[3] Another witness also identified Anthony Velasco by the gang moniker "Cartoon."

that those larger bullets, meaning the rifle ammo, "the 7.62 by 39, belonged to that gun, but she had asked him to remove it from the residence approximately a month prior" to February 19, 2011. Along with the ammunition, the drawer contained photo identification for Isidro-Ausencio.

In the same bedroom, police found a notebook containing many notations, drawings, and writings relating to the Sureño gang. The notebook's cover bore the words "VSUT 13" and "Sniper." ("SUT" is an abbreviation of Sureño Unidos Trece (SUT), a subset of the Sureño gang as we explain *post*.) The letter "n" in Sniper had been crossed out to indicate disrespect toward the Sureño's rival gang, the Norteños. Photographs found in the bedroom showed Isidro-Ausencio and others showing the gang sign for SUT, which referred to the Sureño gang. Kolosova testified Isidro-Ausencio was a former Sureño gang member. She acknowledged Isidro-Ausencio has several Sureño gang tattoos. She also recounted Isidro-Ausencio and Delgado had grown up together.

The police also found a memory book made by Kolosova. It too contained extensive writings and illustrations related to the Sureño gang. One page stated: "Carlos, Southsider, Mr. Sureño, Baby Sniper, X3 and XIII." "Carlos" and "Baby sniper," according to Kolosova, related to Isidro-Ausencio. The roman and arabic numerals referred to the number associated with the Sureño gang.

Delgado and his wife lived in a downstairs apartment at the same complex as Isidro-Ausencio and Kolosova. Delgado's wife would sometimes watch Isidro-Ausencio's son. Kolosova knew Delgado by his moniker, "Spider."

On February 19, 2011, the police arrested Isidro-Ausencio and Delgado. The police interviewed Delgado in Spanish. Delgado waived his *Miranda* rights and gave a detailed confession. Delgado explained he had been babysitting Isidro-Ausencio's son on the day of the shooting when Isidro-Ausencio came into the apartment. Isidro-Ausencio said four African-American males had pulled him out of his car, beaten him up, and taken his cell phone. The assailants said, "Puro Norte! Bloods!" Once inside the apartment,

7

Isidro-Ausencio asked Delgado for a baseball bat. Isidro-Ausencio and Delgado attempted to drive after the assailants because they "were really angry." However, the assailants eluded Isidro-Ausencio on the freeway. When the police stated witnesses had seen Isidro-Ausencio with a rifle, Delgado admitted he saw Isidro-Ausencio leave the apartment with a rifle and believed the firearm was discharged. Isidro-Ausencio and Delgado had the rifle and bat with them in the car as they pursued the assailants. After they lost the assailants, Delgado took over driving from Isidro-Ausencio because Isidro-Ausencio was very angry. Isidro-Ausencio and Delgado drove to an area "where all the bloods and the black guys hang out." Isidro-Ausencio fired four shots at the victims, at which point he ran out of ammunition. To Delgado, African-Americans all looked the same. After the shooting, Isidro-Ausencio did not say anything.

Delgado also explained he and Isidro-Ausencio had been attacked by African-Americans in the past. Delgado had even been stabbed on one occasion. Delgado admitted he and Isidro-Ausencio were members of the Sureño gang. When he first came to the United States, he was told everyone from Mexico is a Southerner. Thus, Delgado saw himself to "represent Mexico."

Sacramento County Sheriff's Department Sergeant Kevin Steed testified as an expert on Hispanic street gangs. He described SUT as a validated subset of the Sureño gang. SUT's most common enemy is the Norteños, the northern Hispanic gang. Sergeant Steed also described the various symbols with which members of the Sureño gang identify. After contacting other law enforcement officials, Sergeant Steed learned Isidro-Ausencio had at least five separate validations as a Sureño gang member. Moreover, Isidro-Ausencio had previously admitted to the police that he was a Sureño gang member. Sergeant Steed explained gangs view intrusions on their territory and lack of deference by others as a sign of disrespect. Members of gangs such as the Sureños are expected to retaliate with violence. Violent acts by gang members gain the respect of fellow gang members. Consequently, Sergeant Steed opined retaliatory shootings and

murders, such as those committed in this case, are committed in furtherance and for the benefit of the perpetrator's gang.

### *Isidro-Ausencio's Defense Evidence*

Kolosova testified on behalf of Isidro-Ausencio, explaining a photo of Isidro-Ausencio and his son -- which had been introduced into evidence -- was taken in 2008. Kolosova denied ever telling Detective Belli about a "large black rifle." She stated she had felt threatened by Detective Belli because he yelled at her and threatened to take her son away.

### *Delgado's Defense Evidence*

Delgado called Jennifer Trujillo, who testified that about a week after the shooting she heard Velasco say he had been in the car with two others at the time of the shooting. Velasco told Trujillo the shooting was gang-related. However, Velasco's girlfriend, Natalya Kolosova, testified he had been with her at home until 5:00 or 5:30 that evening.

### *Prosecution Rebuttal Evidence*

The prosecution called Natalya Kolosova (Tatyana Kolosova's sister), who testified Velasco was with her at the time of the shootings until she left the house between 5:00 and 5:30 p.m. Sergeant Steed testified that sometimes gang members claim responsibility for others' criminal acts in an attempt to gain respect. However, gang members caught telling such lies would suffer "consequences."

DISCUSSION

Appeal by Delgado

## I

### *Delgado's Miranda Rights Waiver*

Delgado contends his taped confession was obtained in violation of his *Miranda* rights, and its introduction at trial compels reversal. Specifically, Delgado argues that as a native Nahuatl speaker, his Spanish speaking skills were too poor to understand the *Miranda* advisements that were given in Spanish. We are not persuaded.

9

## A.

### *Delgado's Motion to Exclude his Statements*

Before trial, Delgado moved to exclude his statements made to the police during a custodial interview on grounds that "linguistic and cultural" issues prevented him from making a voluntary, knowing, and intelligent waiver of his *Miranda* rights. The prosecution opposed the motion, and submitted a written transcript of Delgado's interview. At the Evidence Code section 402 hearing, Delgado testified with the aid of an interpreter who translated from Nahuatl to Spanish, and a second interpreter who interpreted from Spanish to English. Delgado stated he was 21 years old and had come to the United States from Mexico five years earlier. Delgado grew up in a small town and spoke Nahuatl as his primary language. He stated he speaks "a little" Spanish and "very little" English. Delgado had never been arrested before this case.

When the police officers advised him of his rights at the police station, he did not understand them even though he indicated he did due to his fear of the officers. In his hometown, Delgado's uncle was hit by the police after saying "no" to them. The police never asked Delgado if Spanish was his best language, and he was afraid to ask for a Nahuatl interpreter.

The prosecution called Sacramento County Sheriff's Department Deputy Ruben Pena, who testified he is a native Spanish speaker. Deputy Pena spoke in Spanish with Delgado during the interview. During the interview, Delgado was calm and responded in Spanish and even a few times in English. Deputy Pena also authenticated a videotape of the interview the trial court viewed.

The trial court denied Delgado's motion to exclude, and made the following findings:

"At the time of the interview, [defendant] Delgado was 20 years old. He had a very limited formal education. He grew up in a small village in Mexico. His first language was Nahuatl. He has lived in the United States for over five years. He has had

10

prior police contact when he was a juvenile where he discussed with officers his knowledge of the Sureños gang. He speaks Spanish with his wife, his girlfriend, and members of the Sureños gang. And he spoke Spanish with the police officers in the prior contact.

"The DVD that has been marked Court's [exhibit] 1 containing both the video and audio recording of the interview, including the waiver, speaks for itself. But the Court makes the following observations:

"During the giving of the *Miranda* waivers and the entirety of more than an hour interview, [defendant Delgado] never appeared confused or not to understand the question posed, or Deputy Pena's Spanish. [Defendant] Delgado responded in Spanish without hesitation, and appeared to speak Spanish with ease and fluency. It was clear that at certain points [Defendant] Delgado understood the English spoken by Deputy Pena and Detective Turnbull.

"Several times he spoke English to clarify a point. Just as an example, on page 72, line 9, detective Turnbull says, 'Where was the car?' [Defendant] Delgado responds 'pasando' before that was translated, but he respond[s] in Spanish here in court. [¶] . . . [¶]

". . . Defendant [Delgado]'s demeanor throughout the interview is relaxed, calm, and poised. He took naps in between breaks. Almost every time the officers left, and I believe this occurred more than twice, he gets on the floor, sprawls out on his back, legs straight out to sleep. At no point during the interview does [defendant] Delgado appear particularly emotional, distraught or scared. When asked if Spanish would help, he responded, 'Si, esta bien,' or in English, Yes, good. That's on page 11 of the transcript which is Court's [Exhibit] 1-A.

"Deputy Pena read the *Miranda* rights verbatim to defendant [Delgado] in Spanish. And the defendant stated he understood by both verbally responding yes, or si, and physically nodding his head yes after each right was read to him. That is contained

11

starting on page 16 where Deputy Pena first tells him, 'We want to let you know, because you're under arrest, you are not free to leave. We need to let you know your rights.' He later says, line 20, 'So, I'm going to tell you your rights. Okay? And when I speak to you, if you can tell yes or no if you understand. Okay?'

"So here Deputy Pena specifically tells defendant [Delgado] he can either say yes or no. The defendant nods at that point, after which Deputy Pena proceeds to say, 'You have the right to remain silent. You understand?' [D]efendant [Delgado] says, 'Si' and nods.

"Deputy Pena asks, 'Anything you say can and will be used against you in a court of justice. Do you understand?' Defendant [Delgado] says, 'Si,' or yes.

"Deputy Pena goes on to say, 'You have the right to an attorney and having an attorney present before and during an interrogation. Do you understand?' Defendant[Delgado] says, 'Si,' or yes, and nods.

"Deputy Pena says, 'If you cannot afford to pay for an attorney, one will be assigned to you at no cost to represent you before and after the interrogation if you wish. Do you understand?' The defendant says, 'Si,' or yes.

"And then Deputy Pena says, 'Do you understand all the rights I have just explained?' Without hesitation, the defendant says, 'Si,' or yes in English.

"Defendant testified that he knew he would get in . . . trouble. And in the beginning of the interview, he did not tell the truth, his version did change, and when he was confronted with specific evidence, then did he admit to the shooting.

"Both his testimony about his mental state and his initial false statements show that the defendant had an understanding -- at least some understanding of the consequences of waiving his rights and making a statement.

"He never asks for a Nahuatl interpreter. He never indicated he had any trouble understanding the Spanish. And his answers were responsive to the questions asked, showing that he understands the questions.

12

"The Court makes specific credibility findings related to this hearing, and that is, Deputy Pena was credible and his statements were corroborated by what the Court observed firsthand on the DVD. Where there's a conflict between Deputy Pena's statement and the defendant's statement, the Court finds Deputy Pena to be the credible witness.

"The Court finds the defendant was not an entirely credible witness during this hearing, as some of the things he stated were in conflict with what the Court saw on the DVD. Furthermore, the defendant was evasive and not responsive, it appears, when it suited him during the hearing."

## B.

### *Waiver of Miranda Rights*

The Fifth and Fourteenth Amendments to the United States Constitution require that "custodial interrogation be preceded by advice to the putative defendant that he [or she] has the right to remain silent and also the right to the presence of an attorney." (*Edwards v. Arizona* (1981) 451 U.S. 477, 481-482 [68 L.Ed.2d 378], citing *Miranda v. Arizona*, *supra*, 384 U.S., at 479.) "If the accused indicates that he [or she] wishes to remain silent, 'the interrogation must cease.' If he [or she] requests counsel, 'the interrogation must cease until an attorney is present.' " (*Edwards v. Arizona*, at p. 482.) However, these rights may be knowingly and intelligently waived. (*Ibid.*) "The waiver must be 'voluntary in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion, or deception.' (*Moran v. Burbine* (1986) 475 U.S. 412, 421, 89 L.Ed.2d 410), and knowing in the sense that it was 'made with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it.' (*Ibid*.)" (*People v. Sauceda-Contreras* (2012) 55 Cal.4th 203, 219.)

The question of whether an accused has given a knowing and intelligent waiver is "'a matter which depends in each case "upon the particular facts and circumstances

13

surrounding that case, including the background, experience, and conduct of the accused.""" (*Edwards v. Arizona* (1981) 451 U.S. 477, 482.) "The requirement that a defendant 'knowingly and intelligently' waive his [or her] *Miranda* rights 'implies a rational choice based upon some appreciation of the consequences of the decision.'" (*United States v. Garibay* (9th Cir.1998) 143 F.3d 534, 540 (*Garibay*) quoting *Cooper v. Griffin* (5th Cir.1972) 455 F.2d 1142, 1144–1145.)

When the accused asserts lingual or cultural differences that prevented a knowing and intelligent waiver of *Miranda* rights, we examine the record to determine whether the accused understood the nature of the rights being waived. For example, the defendant in *United States v. Martinez* (9th Cir. 1978) 588 F.2d 1227 (*Martinez*) challenged the waiver of his *Miranda* rights on grounds that included his being advised in Mexican-accented Spanish even though he only understood Cuban-accented Spanish. (*Id.* at p. 1234-1235.) The *Martinez* court rejected the challenge, noting the "corroborated testimony given at the suppression hearing to the effect that appellant appeared to understand the *Miranda* warnings as they were read to him." (*Id.* at p. 1235.) Moreover, defendant's "contention that he did not understand the dialect in which the warnings were read to him [was] seriously weakened by the fact that he continued to converse in Spanish with the officer who had read him the warnings, and it was in the course of that conversation that the inculpatory statements were made." (*Ibid.*)

Similarly, a claim of involuntary waiver of *Miranda* rights based on a language barrier was rejected in *Campaneria v. Reid* (2d Cir. 1989) 891 F.2d 1014 (*Campaneria*). In *Campaneria,* defendant claimed "that, because of his poor grasp of English and the confusing circumstances surrounding the questioning, he did not understand the *Miranda* warnings when they were given to him and therefore did not effectively waive his privilege against self-incrimination." (*Id.* at p. 1020.) The defendant was a native Spanish speaker who had been advised of his rights in English. Nonetheless, the *Campaneria* court concluded the waiver was valid because "the record, and in particular

14

the transcript of the recorded interview, reveals that, although he spoke in broken English with an accent and occasionally lapsed into Spanish, his command of English was sufficient for him to have understood the *Miranda* warnings given to him." (*Ibid.*)

Likewise, a waiver given by a native Spanish speaker after being advised of his *Miranda* rights in English was held valid in *United States v. Lugo* (10th Cir. 1999) 170 F.3d 996 (*Lugo*). Although the defendant received only a ninth-grade education and principally spoke Spanish, "his responses to [the officer's] questions demonstrated sufficient understanding of the English language for purposes of the interrogation." (*Id.* at p. 1004.) In support of this conclusion, the *Lugo* court noted the defendant "was neither threatened with nor subjected to any physical punishment." (*Id.* at p. 1005.) In short, a *Miranda* waiver must be knowing and intelligent (*Miranda, supra*, 384 U.S. at p. 475), but need not be in the accused's first language or even a language that he or she speaks well. (*Campaneria, supra,* 891 F.2d at p. 1235; *Martinez, supra*, 588 F.2d at p. 1020; *Lugo, supra*, 170 F.3d at pp. 1004-1005.)

The issue of a defendant's language abilities and understanding of the *Miranda* advisement presents a question of fact for determination by the trial court. Thus, when we review "defendant's claim that his [or her] *Miranda* rights were violated, we must accept the trial court's resolution of disputed facts and inferences, as well as its evaluation of the credibility of witnesses where supported by substantial evidence. (*People v. Whitson* (1998) 17 Cal.4th 229, 248 (*Whitson*); *People v. Wash* (1993) 6 Cal.4th 215, 235–236.)" (*People v. Cruz* (2008) 44 Cal.4th 636, 667.) "We uphold the trial court's findings on the sufficiency of a foreign language *Miranda* advisement if supported by the record." (*People v. Marquez* (1992) 1 Cal.4th 553, 570.)

## C.

### *Delgado's Waiver and Subsequent Statements*

The record supports the trial court's finding Delgado knowingly and intelligently waived his *Miranda* rights. We note the trial court expressly found Delgado's testimony

15

at the Evidence Code section 402 hearing not to have been credible.  By contrast, Deputy Pena's testimony was found to be credible.  Thus, the trial court credited Deputy Pena's assertions that Delgado understood his *Miranda* rights and waived them without coercion.  The transcript and video recording of the interview with Delgado support these findings.

The record shows Deputy Pena advised Delgado of his *Miranda* rights in Spanish. Delgado indicated he understood the advisement of *Miranda* rights.[4]  The record also supports the trial court's finding Delgado understood and was able to communicate effectively with Deputy Pena.  The transcript shows Delgado answered open-ended questions with appropriate answers in Spanish.  Delgado's answers were responsive and articulate.  The video confirms the trial court's finding of Delgado's ability to communicate in Spanish.  Delgado showed no lag in comprehending Deputy Pena's questions, and expressed himself fluidly and -- at times -- at quite some length in Spanish.  Not only was Delgado able to answer in Spanish, but he even indicated he understood a little English when he stated, "I understand a little, but I cannot speak."  The video confirms he sometimes seemed able to understand questions posed in English before the translation into Spanish even began.  Given the fluency Delgado demonstrated in providing responsive answers to the questions, the record amply supports the trial court's findings Delgado understood and spoke Spanish competently.

The transcript and video recording clearly show Delgado was advised of his *Miranda* rights, indicated he understood his rights, and waived them.  The trial court found Delgado's waiver was knowing and intelligent.  We conclude the totality of the circumstances supports the finding Delgado understood the nature and consequences of

---

[4]     In recounting Delgado's answers to the officers' questioning during the custodial interview, we rely on the English translation of Delgado's statements provided in the transcript of the interview.

his rights when he waived them. Delgado's waiver was not tainted by lack of understanding. Thus, we reject Delgado's reliance on *Garibay, supra,* 143 F.3d 534. In *Garibay*, the Ninth Circuit Court of Appeals found a defendant with little English-speaking ability and low mental capacity did not waive his *Miranda* rights in a knowing and intelligent manner. (*Id.* at p. 537.) The officer in *Garibay* simply assumed the defendant would understand a *Miranda* advisement in English even though the officer "admitted that he had to rephrase questions when Garibay did not seem to comprehend what was said to him." (*Id.* at p. 537.) Here, the interview of Delgado was conducted in Spanish -- a language with which Delgado displayed proficiency. Delgado's responsive answers throughout the questioning stand in marked contrast to Garibay's difficulty in comprehending his questioning.

In sum, we conclude the trial court's finding of a knowing and intelligent waiver of *Miranda* rights was supported by the transcript and video recording of Delgado's custodial interview. Accordingly, the trial court did not err in denying Delgado's motion to exclude the evidence of his custodial interview from being admitted at trial.

Appeal by Isidro-Ausencio

## II

### *Admission of Isidro-Ausencio's Gang Moniker "Sniper"*

Isidro-Ausencio contends the trial court erred in admitting evidence of his gang moniker, "Sniper." He argues the gang moniker was inflammatory and likely used by the jury as evidence of criminal disposition to shoot people. We reject the argument.

### A.

### *Motion to Exclude Evidence Concerning Isidro-Ausencio's Gang Moniker*

Before the start of trial, Isidro-Ausencio moved to exclude evidence of his gang moniker on grounds it prejudicially showed disposition to commit a firearm-related crime. The prosecutor opposed the motion, arguing identity was an issue at trial and some witnesses knew Isidro-Ausencio only as "Sniper." The prosecutor further argued

17

the gang moniker was not impermissible character evidence or unduly prejudicial compared to the charged murders. The trial court denied the motion, and explained:

"Applying the cases cited by both counsel and engaging in the [Evidence Code section 352[5]] analysis, the Court finds that the evidence concerning the defendant's moniker in the instant case is highly probative. I expect the evidence to show that the defendant knew that his moniker was Sniper, did not stop people from referring to him by that name, and as in Leon,[6] with the gang expert's testimony explaining the significance of the defendant's moniker, it would show the defendant was, as in that case, where defendant was advertising his intent to model himself after a killer do[ll], the defendant was advertising his intent to model himself after a sniper. The moniker Sniper cannot be said to be, I don't think necessarily any more prejudicial than the name of a homicidal maniacal doll that slashes people indiscriminately as in the case involving Leon.

"The cases are clear that this evidence is deemed to be probative as to the defendant's motive and intent as well as gang affiliation. The fact that the defendant's moniker, Sniper, versus Pollo makes it more prejudicial, but it also makes it more probative. And the Court cannot say that the moniker is any more inflammatory than what I understand the alleged facts surrounding the charged offense to be.

"I also haven't heard anything that would concern the Court about undue consumption of time in presentation of this evidence. It is not being admitted to show that the defendant has a propensity or prejudice to commit this crime. And to address your concern, given the specific facts of this case, that the jury would misuse the

---

**5** Evidence Code section 352 provides: "The court in its discretion may exclude evidence if its probative value is substantially outweighed by the probability that its admission will (a) necessitate undue consumption of time or (b) create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury."

**6** *People v. Leon* (2010) 181 Cal.App.4th 452 (*Leon*).

18

evidence for that purpose, I would advise you to draft a limiting instruction for the Court to give to the jury regarding this evidence.

"But after having done the 352 analysis and applying the cases to this evidence, the Court finds the probative value is not substantially outweighed by the probability that its admission would, A, necessitate undue consumption of time, or B, create a substantial danger of undue prejudice, confusing the issues or misleading the jury."

The trial court also ordered the prosecution's gang expert not to opine the gang moniker was based on past conduct by Isidro-Ausencio.

## B.

### *Admissibility of Gang Evidence*

Consistent with the general rule regarding admissibility of evidence, "[g]ang evidence is admissible if it is logically relevant to some material issue in the case other than character evidence, is not more prejudicial than probative, and is not cumulative." (*People v. Avitia* (2005) 127 Cal.App.4th 185, 192 (*Avitia*) [collecting authority].) Moreover, "[g]ang evidence is relevant and admissible when the very reason for the underlying crime, that is the motive, is gang related. (See, e.g., *People v. Frausto* (1982) 135 Cal.App.3d 129, 140 [motive].) ' "[B]ecause a motive is ordinarily the incentive for criminal behavior, its probative value generally exceeds its prejudicial effect, and wide latitude is permitted in admitting evidence of its existence." [Citations.]' " (*People v. Samaniego* (2009) 172 Cal.App.4th 1148, 1167-1168, quoting in part *People v. Gonzalez* (2005) 126 Cal.App.4th 1539, 1550.)

Evidence concerning a defendant's gang moniker may be admitted as relevant to any disputed issue of fact, including identity, motive, opportunity, intent, preparation, plan, knowledge, and absence of mistake or accident. (*Leon, supra*, 181 Cal.App.4th at p. 461.) The *Leon* court affirmed the admission of evidence the defendant used the gang moniker "Chucky" to refer to a homicidal doll in movies that indiscriminately killed people. (*Id.* at p. 462.) The *Leon* court rejected a contention the gang moniker evidence

19

was unduly prejudicial. *Leon* notes, "Evidence cannot be excluded merely because it is prejudicial. 'Virtually all evidence is prejudicial or it isn't material.' (*Dollar v. Long Mfg., N.C., Inc.* (5th Cir.1977) 561 F.2d 613, 618.) Pursuant to section 352, evidence can be excluded only if it is unduly prejudicial so as to outweigh its probative value." (*Leon*, at p. 460.)

As to the comparison of prejudicial and probative value of the Chucky gang moniker, the *Leon* court explained: "The Chucky doll evidence had a tendency in reason to prove that, when appellant shot at the [other car], he acted with the specific intent to kill and with both premeditation and deliberation. The evidence showed that appellant knew his moniker was derived from the Chucky doll and that he took pride in the derivation. In the movies the Chucky doll is a 'homicidal doll' that 'comes to life' and 'goes about slashing people.' It is reasonable to infer that appellant wanted to emulate the Chucky doll's exploits and show his fellow gang members that his moniker was well-warranted since he, like the Chucky doll, was also a killer. In the world of criminal street gangs, appellant's moniker was a badge of honor because it connoted extreme violence. A gang expert testified that for gang members respect is 'almost everything,' and respect is based on a member's 'level of violence.' " (*Leon*, *supra*, 181 Cal.App.4th at p. 461.)

In reviewing a claim of prejudicial error in the admission of evidence concerning a defendant's gang moniker, we consider whether the trial court abused its discretion. (*People v. Carter* (2003) 30 Cal.4th 1166, 1194.) " 'A trial court's discretionary ruling under this statute " 'must not be disturbed on appeal except on a showing that the court exercised its discretion in an arbitrary, capricious or patently absurd manner that resulted in a manifest miscarriage of justice. [Citations.]' " [Citation.]' (*People v. Williams* (2008) 43 Cal.4th 584, 634–635.)" (*Leon*, *supra*, 181 Cal.App.4th at p. 460.)

20

## C.

### *Admission of Isidro-Ausencio's Gang Moniker*

The trial court properly admitted evidence regarding Isidro-Ausencio's gang moniker because the evidence was highly probative and not unduly prejudicial. The prosecution had the burden of proving Isidro-Ausencio committed the murders for the benefit of a street gang. The fact Isidro-Ausencio had a gang moniker by which he was known and he claimed as his own in his notebook was highly probative as to his gang participation. As Sergeant Steed explained, "A moniker for criminal street gang members potentially means a couple of things. One, it's a way of identifying themselves to remain elusive from law enforcement, making it more difficult for us to identify them. Sometimes if people just refer to themselves, or other gang members refer to them, it's difficult for us, as investigators, to identify who they are. [¶] . . . [¶] Another way of getting monikers is by the criminal acts in which you commit, you're proficient at. If you're a good thief, they may call you The Thief. But generally speaking, their monikers are given to them by other gang members or they're developed themselves by the criminal acts that they commit, and they'll nickname them after those crimes."

As in *Leon*, the gang moniker was highly probative in showing Isidro-Ausencio's claim to respect in the Sureño gang. As the prosecution's gang expert noted, gang members seek to increase the status of their gang by committing violent acts and instilling fear on the community. Isidro-Ausencio's gang moniker claimed a murderous ability that the prosecution was entitled to show. As the *Leon* court explained, "A defendant charged with committing a crime for the benefit of a criminal street gang has no entitlement to an antiseptic portrayal of himself [or herself]. If he [or she] elects to portray himself [or herself] as a killer before he [or she] commits a murder, he [or she] should not be able to have what is tantamount to a 'name change' thereafter." (*Leon*, *supra*, 181 Cal.App.4th. at p. 462.)

21

The gang moniker was also key in connecting Isidro-Ausencio to the shootings for which he was charged. The identity of the shooter was a central issue at trial. During his custodial interview, Delgado referred to the shooter as "Sniper." The moniker was highly probative as to the central issue of the case: who fired the high-power rifle that killed the three victims. Based on the key role the gang moniker played in connecting Isidro-Ausencio to the charged murders, we reject his suggestion this evidence was merely cumulative.

Contrary to Isidro-Ausencio's assertion of undue prejudice, we -- like the *Leon* court -- conclude the admission of the gang moniker evidence " 'paled in comparison to the testimony concerning the actual shooting.' " (*Leon*, *supra*, 181 Cal.App.4th. at p. 462.) In this case, the evidence showed three victims were shot with a high-power rifle. The victims were not part of the attack on Isidro-Ausencio, yet lay moaning and suffering in the street before they died of their wounds. In comparison, the gang moniker testimony was not unduly prejudicial.

We reject Isidro-Ausencio's reliance on *People v. Humiston* (1993) 20 Cal.App.4th 460 (*Humiston*). *Humiston* involved the admission of testimony that the defendant used "187" to identify herself when communicating by pager with her boyfriend. (*Id.* at pp. 466-467, 480.) Defendant's trial attorney, "knowing the code was 187, the Penal Code section for murder, objected on the ground the code number was irrelevant, more prejudicial than probative and improper character evidence." (*Id.* at p. 480.) The trial court admitted the evidence, and the Court of Appeal reversed. (*Id.* at p. 480-481.) The *Humiston* court reasoned that "evidence [defendant] used the Penal Code section for murder, eight months before the crime, was not relevant to prove any fact other than her disposition to commit murder. . . . The coincidence of using the code for murder and later committing murder is precisely what makes the evidence so prejudicial in the eyes of the jury." (*Id.* at p. 481.) *Humiston* differs from this case because Isidro-Ausencio's gang moniker was highly probative as to issues of his gang participation, his

22

identity being the perpetrator of the charged offenses, and his motive for the shooting. As highly probative on several key issues at trial, the trial court properly admitted the evidence of Isidro-Ausencio's gang moniker.

## III

### *Exclusion of Photographs Showing Isidro-Ausencio with his Son*

Isidro-Ausencio contends the trial court erred in excluding relevant evidence in the form of photographs depicting him with his fiancée and children. He argues that "the proffered evidence was relevant to prove [Isidro-Ausencio] was a family man and a loving father to his children, who participated in their life, care, and emotional well-being over time." We conclude the evidence was irrelevant and thus inadmissible.

### A.

### *Isidro-Ausencio's Photographs*

Isidro-Ausencio sought to admit 14 photographs of himself with his fiancée and children to show good character.[7] Isidro-Ausencio's trial attorney explained, "[B]asically I sought to bring in some of those photographs to show that the individual who is the defendant in this case is not 24/7 a gangster who is running around looking for respect or revenge in a fashion described by Detective Steed." The prosecutor objected to the admission of the photographs on grounds they were not relevant and had no purpose other than to gain sympathy from the jury for Isidro-Ausencio. The prosecutor noted a photograph of Isidro-Ausencio and his youngest son had already been admitted into evidence.

The trial court sustained the objection, and explained:

"Because of the objection, the Court looked at Exhibits B through O at side bar with the attorneys. And just as an example, they show the defendant with either one or

---

[7]    Isidro-Ausencio does not renew his argument, made in the trial court, that the photographs were admissible as evidence of his good character.

both of his children.  D shows him with both children in front of a Christmas tree opening presents.  H shows him kissing his wife, holding a young child.  L shows him bottle-feeding an infant.  And the rest show him with either one or both children.  These photos are not relevant to any material issue in dispute.  No one is disputing he has the two children or the age of the children.  There have already been a couple of photographs introduced with him and his children.

"As to character evidence, being a father, having children, is not a character at issue.  If there was evidence of his being a person of peace, or lack of violence, or law abidingness, but these photographs just depicting him and his children do not go to those character traits.  Being a father and a gang member are not mutually exclusive.  And I don't think the evidence has been that he's 24/7 [an] evil person or doing things for the gang.  I think what's relevant here is whether -- for the People to prove was whether he is a member of a gang and whether the crime committed was committed in association with the gang.

"So after having reviewed B through O, the Court found they were not relevant.  And certainly under 352, any probative value is substantially outweighed by it necessitating undue consumption of time or creating a substantial danger of undue prejudice or eliciting sympathy.  So they're just not relevant.  So the Court excluded B through O."

## B.

### *Relevance*

As we have previously noted in part II B., only relevant evidence is admissible. (*Avitia*, *supra*, 127 Cal.App.4th at p. 192; see also Evid. Code, § 350 ["No evidence is admissible except relevant evidence"].)  So too we note again the admission or exclusion of evidence represents a matter addressed to the sound discretion of the trial court that we will not disturb in the absence of a showing that the evidentiary ruling was arbitrary, capricious, or exceeded the bounds of reason.  (*Leon*, *supra*, 181 Cal.App.4th at p. 460.)

24

The trial court did not abuse its discretion in excluding the 14 photographs of Isidro-Ausencio with his fiancée and children. Proof Isidro-Ausencio was a father and a family man had no bearing on whether he committed the charged offenses for the benefit of a street gang. Unfortunately, even good family relationships are not mutually exclusive with a willingness to commit first degree murder. (See, e.g., *People v. Virgil* (2011) 51 Cal.4th 1210, 1273].) Here, the charged offenses did not require proof Isidro-Ausencio was a gangster during every hour of every day. Instead, the prosecution had to show only that Isidro-Ausencio fired three fatal shots for the benefit of a criminal street gang. (§§ 186.22, subd. (b)(1), 187.) Even if, as Isidro-Ausencio argues on appeal, the photographs "tended to prove [he] was a loving father and family man," they did not disprove his capacity or willingness to commit murder to preserve his status within his gang. In short, the photographs of Isidro-Ausencio with his immediate family members were not relevant.

Exclusion of the photos offered by Isidro-Ausencio's trial attorney did not undermine his ability to present a defense. Isidro-Ausencio was able to show he had been in a committed relationship with Kolosova for several years. Kolosova also testified she lived with Isidro-Ausencio and their son in February 2011. In questioning Kolosova during the defense case, Isidro-Ausencio's trial attorney emphasized a photo that had been admitted into evidence and showed Isidro-Ausencio with his son. The trial court did not abuse its discretion in excluding additional photographs showing Isidro-Ausencio with Kolosova and his sons.

## IV

### *Request to Modify Jury Instruction Regarding Circumstantial Evidence*

Isidro-Ausencio contends the trial court erred in refusing to modify the standard CALCRIM jury instructions regarding circumstantial evidence. He argues the jury

25

should have been specifically instructed Sergeant Steed's testimony constituted circumstantial evidence.**8** We disagree.

## A.

### *Circumstantial Evidence Jury Instructions*

Isidro-Ausencio's counsel requested modification of the standard CALCRIM instruction regarding circumstantial evidence. As pertinent to Isidro-Ausencio's argument on appeal, his trial attorney filed a request to "ask that the following be added to [CALCRIM No.] 224. [¶] The Opinion testimony of [Sergeant] Steed is circumstantial evidence." In support of the request, Isidro-Ausencio's trial attorney argued: "Without an express instruction, the jurors may not understand that opinion testimony is circumstantial evidence. (See *People v. Danks* (2004) 32 C4th 269, 528. 'Hence, the opinions of experts have uniformly been held to constitute circumstantial evidence in California.' Pp. 579-625 See also *People v. Goldstein* (1956) 139 CA2d, 146 at 153."

The trial court instructed the jury with CALCRIM Nos. 223 and 224 as follows:

"**223. Direct and Circumstantial Evidence: Defined** [¶] Facts may be proved by direct or circumstantial evidence or by a combination of both. *Direct evidence* can prove a fact by itself. For example, if a witness testifies he saw it raining outside before he came into the courthouse, that testimony is direct evidence that it was raining. Circumstantial evidence also may be called indirect evidence. *Circumstantial evidence* does not directly prove the fact to be decided, but is evidence of another fact or group of facts from which you may logically and reasonably conclude the truth of the fact in question. For example, if a witness testifies that he saw someone come inside wearing a

---

**8** Although Isidro-Ausencio quotes the entirety of the proposed pinpoint instruction, his argument on appeal focuses exclusively on the request to add the sentence about Sergeant Steed's testimony.

26

raincoat covered with drops of water, that testimony is circumstantial evidence because it may support a conclusion that it was raining outside. [¶] Both direct and circumstantial evidence are acceptable types of evidence to prove or disprove the elements of a charge, including intent and mental state and acts necessary to a conviction, and neither is necessarily more reliable than the other. Neither is entitled to any greater weight than the other. You must decide whether a fact in issue has been proved based on all the evidence. "**224. Circumstantial Evidence: Sufficiency of Evidence** [¶] Before you may rely on circumstantial evidence to conclude that a fact necessary to find the defendant guilty has been proved, you must be convinced that the People have proved each fact essential to that conclusion beyond a reasonable doubt. [¶] Also, before you may rely on circumstantial evidence to find the defendant guilty, you must be convinced that the only reasonable conclusion supported by the circumstantial evidence is that the defendant is guilty. If you can draw two or more reasonable conclusions from the circumstantial evidence, and one of those reasonable conclusions points to innocence and another to guilt, you must accept the one that points to innocence. However, when considering circumstantial evidence, you must accept only reasonable conclusions and reject any that are unreasonable."

**B.**

***Duty to Instruct the Jury on a Defense Theory***

As the California Supreme Court has held, " 'A trial court must instruct on the *law* applicable to the facts of the case. [Citation.] In addition, a defendant has a right to an instruction that pinpoints the theory of the defense. [Citation.] The court must, however, refuse an argumentative instruction, that is, an instruction "of such a character as to invite the jury to draw inferences favorable to one of the parties from specified items of evidence." ' (*People v. Mincey* (1992) 2 Cal.4th 408, 437.)" (*People v. Panah* (2005) 35 Cal.4th 395, 486.) "An instruction that directs the jury to ' "consider" ' certain evidence is properly refused as argumentative. (*Id*. at p. 1135.) 'In a proper instruction, "[w]hat is

27

pinpointed is not specific evidence as such, but the theory of the defendant's case.'"
([*People v. Wright* (1988) 45 Cal.3d 1126,] 1137, quoting *People v. Adrian* (1982) 135
Cal.App.3d 335, 338.)" (*People v. Ledesma* (2006) 39 Cal.4th 641, 720.)

We note Isidro-Ausencio does *not* contend CALCRIM Nos. 223 and 224 misstate
the law regarding circumstantial evidence. Instead, he argues the instructions should
have been supplemented because case law establishes opinions of police officers "are
treated as circumstantial evidence." Be that as it may, case law is equally clear that
circumstantial evidence alone suffices to prove the commission of a crime. (*People v.
Livingston* (2012) 53 Cal.4th 1145, 1166.) Here, the defense theory of the case was that
the circumstantial evidence was too weak to connect Isidro-Ausencio to the shootings.

However, the proposed pinpoint instruction did not concern the defense's theory
of the case. Instead, the additional language proposed by Isidro-Ausencio's trial attorney
focused on a specific piece of *evidence*, namely Sergeant Steed's testimony. The defense
is not entitled to have specific evidence highlighted -- or, as here, denigrated -- in the jury
instructions. (*People v. Wright* (1988) 45 Cal.3d 1126, 1137.)

CALCRIM Nos. 223 and 224 sufficed to explain the concept and value of
circumstantial evidence to the jury. The proposed pinpoint instruction would have
improperly focused on a particular piece of evidence. For that reason, the requested
pinpoint instruction was correctly refused by the trial court.

## V

### *Whether the Trial Court Should Have Instructed on Voluntary Manslaughter*

Isidro-Ausencio next argues the trial court should have instructed the jury on a
lesser included offense of first degree murder, namely voluntary manslaughter. Noting
evidence that he was enraged after being attacked, Isidro-Ausencio contends a heat of
passion finding by the jury would have supported a voluntary manslaughter conviction.
We disagree.

Manslaughter is "a lesser, necessarily included, offense of intentional murder." (*People v. Lee* (1999) 20 Cal.4th 47, 58.)  The offense of voluntary manslaughter is committed "when the killing is 'upon a sudden quarrel or heat of passion.' " (*Ibid.*; § 192, subd. (a).)  The trial court has a sua sponte duty to instruct the jury on voluntary manslaughter when the evidence at trial of heat of passion is "substantial enough to merit consideration" by the jury.  (*People v. Breverman* (1998) 19 Cal.4th 142, 162.)  "The provocation which incites the defendant to homicidal conduct in the heat of passion must be caused by the victim (see *In re Thomas C*. (1986) 183 Cal.App.3d 786, 798), or be conduct reasonably believed by the defendant to have been engaged in by the victim. (See *People v. Brooks* (1986) 185 Cal.App.3d 687, 694; see also 1 Witkin & Epstein, Cal. Criminal Law (2d ed. 1988) Crimes Against the Person, § 512, p. 579.)  The provocative conduct *by the victim* may be physical or verbal, but the conduct must be sufficiently provocative that it would cause an ordinary person of average disposition to act rashly or without due deliberation and reflection."  (*People v. Lee, supra,* 20 Cal.4th at p. 59, italics added.)

In this case, there was no evidence the three murder victims were involved in the beating of Isidro-Ausencio.  Indeed, there was no evidence Isidro-Ausencio knew *anything* about the murder victims before he shot them.  Instead, the evidence showed Isidro-Ausencio and Delgado chose the three victims simply because they were African-American and Isidro-Ausencio had been beaten by African-Americans.  Because the record is devoid of any suggestion the murder victims did anything to provoke Isidro-Ausencio, there was insufficient evidence to warrant the giving of a voluntary manslaughter instruction.

29

# VI

## *Whether the Trial Court Erred in Denying a Continuance of Trial*

Isidro-Ausencio contends the trial court erred in denying his motion to continue trial to investigate statements of a witness to the effect Velasco claimed credit for the drive-by shooting. We reject the claim of error.

## A.

### *Motion for Continuance*

At the outset of trial, the prosecutor sent an e-mail to defense counsel and the court to inform them, "We took an additional statement from the [confidential] witness this afternoon. . . . She confirms that she heard Cartoon say he was in the car and there were two other people in the car. One was Sniper and she can't remember the name of the other. She says Cartoon said that Sniper was not the shooter. Cartoon claimed that HE had 'funk' with the victims at a liquor store on Folsom Blvd. before the shooting. [¶] I will NOT release contact information for the witness. She currently has been threatened as a 'snitch' and there have been threats on her life. I will make her available through the DA gang investigator." At the next court appearance, trial counsel for Delgado and Isidro-Ausencio moved for a continuance of trial to investigate the statements of the confidential witness.

The prosecutor objected to any continuance on grounds Velasco's statements had been mere puffery that had been undermined by other evidence. She noted Velasco made a "phone call [that] lasted for 12 minutes and 39 seconds. And we know by the cell towers that it was pinging off of the cell tower at Fair Oaks and Manzanita by [Velasco's] apartment. This phone call did not conclude until after 4:30 p.m. The shootings occurred at approximately 4:28 p.m. And based on those records, made it impossible for [Velasco] to be in the vehicle when these shootings occurred in Rancho Cordova. There are [a] multitude of cell phone towers near the shooting scene. One at Fair Oaks and Manzanita is not one of them. There is approximately four miles' distance between [Velasco's]

30

apartment and where the victims were shot." Moreover, Kolosova's sister claimed to have been at home with Velasco all day until she left at 5:00 p.m.

The trial court denied the motion for a continuance and explained the denial of the continuance did not preclude trial counsel from investigating the statements of the confidential witness. The trial court stated, "You should pursue it, but I'm not sure if a continuance is necessary for you to pursue it. All the witnesses that the DA mentioned in her recitation of the discovery you've already had, I believe, are under subpoena and available, including the two girlfriends, Natalya and Tatyana . . . . [¶] We have [Velasco] here in custody. The witness who made the statement regarding [Velasco's] statement is available. So -- and this trial is anticipated to go for another two weeks. So I'm not sure why you can't pursue what you need to pursue."

In his defense, Delgado called Jennifer Trujillo to testify she heard Velasco say he was in the car during the shooting. Velasco said the shooting was gang-related and he "had to leave" because he was worried he was wanted for the murders.

### B.

### *Continuances*

Section 1050, subdivision (e), provides that "[c]ontinuances shall be granted only upon a showing of good cause." "When a continuance is sought in the midst of trial, the trial judge ' " 'must consider not only the benefit which the moving party anticipates but also the likelihood that such benefit will result, the burden on other witnesses, jurors and the court and, above all, whether substantial justice will be accomplished or defeated by a granting of the motion.' " [Citations.]' (*People v. Samayoa* (1997) 15 Cal.4th 795, 840 (*Samayoa*).) 'The burden is on [the defendant] to establish an abuse of judicial discretion. . . .' [Citation.] '[A]n order of denial is seldom successfully attacked.' [Citation.]" (*People v. Beeler* (1995) 9 Cal.4th 953, 1003, overruled on another ground in *People v. Pearson* (2013) 56 Cal.4th 393, 462.)

31

The trial court did not abuse its discretion in denying a continuance to investigate Velasco's claim of participation in the shootings. Isidro-Ausencio argues Velasco's statements were exculpatory evidence. True. However, Isidro-Ausencio fails to acknowledge the jury actually heard the evidence concerning Velasco's claim to participation in the shooting. Thus, there was no error and no prejudice arising out of the trial court's denial of a continuance.

We also reject Isidro-Ausencio's assertion the continuance could have helped him develop witnesses and testimony to establish a heat of passion defense. As we explained in part V, the heat of passion defense was unavailable because there was no evidence the murder victims caused any provocation of Isidro-Ausencio. Velasco's claim of participation in the shooting would not have rendered the heat of passion defense applicable to this case. Accordingly, we conclude Isidro-Ausencio has not established any error or prejudice in the denial of the motion for a continuance.

## VII

### *Cumulative Error*

Isidro-Ausencio contends the cumulative effect of errors committed at trial violated his right to due process of law under the Fourteenth Amendment to the United States Constitution. We have not found any error occurring during trial. Consequently, there are no multiple errors to cumulate to his prejudice. (*People v. Sanders* (1995) 11 Cal.4th 475, 565; *People v. Cudjo* (1993) 6 Cal.4th 585, 630.)

## VIII

### *Whether the Trial Court Properly Imposed Consecutive Gang Enhancements*

Isidro-Ausencio contends his consecutive sentences for three gang enhancements imposed under section 186.22, subdivision (b)(1)(C), should be stricken. Specifically, he argues that "[w]here a gang-related first-degree murder is punishable by 25 years to life, section 186.22, subdivision (b)(1)(C)'s 10-year enhancement does not apply." The contention has merit.

32

The criminal street gang sentence enhancement set forth in section 186.22, subdivision (b)(1), increases the penalties for underlying crimes when those crimes are punishable by a determinate term. (*People v. Sengpadychith* (2001) 26 Cal.4th 316, 327 (*Sengpadychith*).) Nonetheless, as the *Sengpadychith* court noted, for felony offenses that are punishable by an indeterminate term of imprisonment for life, "the gang enhancement provision does not alter the indeterminate term of life imprisonment; it merely prescribes the minimum period the defendant must serve before becoming eligible for parole. (§ 186.22, subd. (b)(5) [providing for this category of felonies committed to benefit a street gang, the defendant 'shall not be paroled until a minimum of 15 calendar years have been served'].) Thus, for these felonies, the gang enhancement provision does *not* increase the life term for the underlying offense." (*Sengpadychith*, at p. 327.)

Also instructive is the California Supreme Court's guidance in *People v. Lopez* (2005) 34 Cal.4th 1002. *Lopez* presented the question of whether a first degree murder committed for the benefit of a gang was subject to the 10-year enhancement in section 186.22, subdivision (b)(1)(C), or whether the murder was instead subject to the 15-year minimum parole eligibility term of section 186.22, subdivision (b)(5). (*Lopez,* at p. 1006.) The California Supreme Court held the Legislature "intended section 186.22[, subdivision] (b)(5) to encompass both a straight life term as well [as] a term expressed as years to life (other than those enumerated in subdivision (b)(4)) and therefore intended to exempt those crimes from the 10-year enhancement in subdivision (b)(1)(C)." (*Lopez*, at p. 1007.)

Here, Isidro-Ausencio was sentenced to serve three terms of life in prison without possibility of parole because he committed the murders with special circumstances. His life sentences are each subject to the 15-year minimum for parole of section 186.22, subdivision (b)(5). However, they are not subject to the 10-year enhancement of subdivision (b)(1)(C). (*Sengpadychith*, *supra*, 26 Cal.4th at p. 327.) Consequently, we

modify Isidro-Ausencio's sentence by striking the 10-year gang enhancements for his three murder convictions.

## DISPOSITION

As to Francisco Ignacio Delgado, the judgment is affirmed.  As to Saul Isidro-Ausencio, the ten-year gang enhancements imposed pursuant to Penal Code section 186.22, subdivision (b)(1), for his three counts of murder are stricken.  As modified, the judgment as to Isidro-Ausencio is affirmed.  The trial court is directed to amend Isidro-Ausencio's abstract of judgment to reflect this modification of judgment and to forward a certified copy to the Department of Corrections and Rehabilitation.


_____/s/_____
                        HOCH, J.


We concur:


_____/s/_____
BUTZ, Acting P. J.


_____/s/_____
MAURO, J.